Coos
No. 88-482

# James M. MacFarlane

## v.

# Beryl Rich (MacFarlane)

December 29, 1989

*McKean, Mattson and Mulligan P.A.*, of Laconia (*Julia M. Nye* on the brief and orally), for the plaintiff.

*Law Offices of Jack P. Crisp, Jr., and Associates*, of Berlin (*Peter F. Kuntz* on the brief, and *Jack P. Crisp, Jr.*, orally), for the defendant.

BROCK, C.J. The issue in this marital matter is whether an antenuptial agreement purporting to fix the post-divorce rights of the parties is valid and enforceable. The plaintiff-husband appeals from certain portions of a decree of divorce entered by the Superior Court (*Smith*, J.) which distributed marital assets and awarded alimony in accordance with the terms of an antenuptial agreement executed by the parties prior to their marriage. We affirm.

The plaintiff presents three issues for our review: first, did the trial court err in admitting and considering parol evidence contradicting the express terms of paragraph 7L of the antenuptial agreement; second, did the trial court err in refusing to enforce paragraph 7L of the antenuptial agreement insofar as it rendered the agreement null and void if the marriage broke down due to an extramarital relationship; and third, did the trial court err in enforcing paragraph 7C of the agreement according to its explicit terms when the financial circumstances of the husband had changed by the time of the divorce.

The defendant-wife is an English subject and the plaintiff a resident of New Hampshire. The parties met in 1982 while the plaintiff was vacationing in England. At that time, the defendant lived with her sixteen-year-old daughter in Saltdean, England, and held two jobs. She managed a refreshment stand at Gatwick International Airport, south of London, and did regular freelance promotion work for several promotion agencies.

The plaintiff proposed marriage to the defendant in November of 1983, and she accepted. The parties agreed that once they were married, the defendant would leave her home and jobs in England and move to New Hampshire. Some time later, the plaintiff first raised the issue of an antenuptial agreement, informing the defendant that he would not marry her without one. When asked if she was opposed to the idea of an antenuptial agreement, the defendant stated that she found the idea "distasteful, mercenary, and extremely cold." When the plaintiff insisted upon such an agreement, a disagreement arose between the parties which resulted in cancellation of the wedding plans.

Eventually, the idea of an antenuptial agreement was dropped, and the parties determined once again to be married. The plaintiff did not renew his efforts to enter an antenuptial agreement until three days prior to the wedding date. This time the defendant acquiesced, and an agreement was signed by the parties on October 2, 1984, the day they were wed.

After the marriage, they resided in Portsmouth, New Hampshire. The plaintiff was employed as a pilot for American Airlines, and was frequently away from home, but the parties managed to take several lengthy vacations together, travelling to Belgium, Norway, Hong Kong, and Thailand. According to the defendant, however, the plaintiff was generally not a good companion on these trips; rather, he was uncommunicative and moody and drank to excess on many occasions.

In December of 1985, the parties travelled to the Cayman Islands for the purpose of spending Christmas with the defendant's son. The defendant prepared a Christmas dinner for the family and guests, but on Christmas evening, midway through the meal, the plaintiff left the table, stating that he was going to change his clothes. To the defendant's astonishment, the plaintiff did not return that night, or ever after, and he failed to notify her of his whereabouts. She received no communication from him until January of 1986 when he cancelled her "VISA" card, and she did not see him again until the date of the trial in this matter.

The plaintiff's libel for divorce, filed on October 10, 1986, did not disclose the existence of the antenuptial agreement and was based on the grounds of irreconcilable differences. When the defendant's answer asserted the antenuptial agreement, the plaintiff moved to rescind the agreement, claiming that it lacked consideration, was obtained by fraud, and was unconscionable. He proceeded upon that theory for the entire pretrial discovery period.

On the day set for trial, however, he withdrew the motion to rescind and alleged the occurrence of the only contingency contemplated by the agreement that could nullify its terms; specifically, he claimed to have left the defendant for another woman. The plaintiff testified that he met a woman named "Talk" while vacationing in Thailand in August of 1986, and immediately fell in love with her. He announced that he was living with the woman and intended to marry her once his divorce was finalized. He attributed the breakdown of his marriage to his newfound relationship, contending that he had hoped for a reconciliation with the defendant up until the time that he met his present love.

The plaintiff thus conceded the validity of the antenuptial agreement, but sought to invoke paragraph 7L, which, read literally, would allow him to avoid the agreement entirely if he left his wife for another woman. Paragraph 7L of the parties' antenuptial agreement provides as follows:

> "If James F. MacFarlane leaves Beryl Rich for another woman and lives apart from Beryl Rich, and a petition for legal separation or libel for divorce is [filed] by either party as a result therefrom, the parties hereby agree that this entire agreement shall become null and void, and that all matters relative to alimony, support and property division shall be determined by the court presiding over the legal separation or divorce proceedings."

At trial, the defendant sought to prove that a literal construction of paragraph 7L would not give effect to the parties' intentions, because under the circumstances, such a reading would permit the plaintiff to profit by his own wrongdoing. According to the defendant, paragraph 7L was inserted into the agreement in response to her concern over the philandering of her first husband; in essence, she wanted more protection than the antenuptial agreement would afford against an unfaithful husband. She testified, over objections based on the parol evidence rule, that the purpose of paragraph 7L was to permit her to "void the contract and ask the court for more" in the event that her husband ran off with another woman.

The attorney who drafted the antenuptial agreement also testified to this effect, adding that a court would consider the duration of the marriage in making an award of support and property distribution. Noting that in a long-term marriage the defendant would likely benefit if a court determined the financial incidents of the parties' divorce, the attorney explained that the reverse would be true in a short-term marriage, if a court, in making its

award, attached substantial weight to the limited duration of the marriage. The attorney thus testified, over objections based on the parol evidence rule, that under the circumstances of the case at hand, the benefit of a court's determination would most certainly inure to the plaintiff, which was not the result the parties expected to accomplish by paragraph 7L of their agreement.

Following several days of testimony, the trial court granted the parties a divorce on the ground of irreconcilable differences and ordered the plaintiff to make the alimony payments called for under the antenuptial agreement. The court found that paragraph 7L is clear and unambiguous on its face, but refused to enforce it *carte blanche*, ruling instead that the provision is void as against public policy to the extent that it permits the plaintiff to use his own marital misconduct to escape his obligations. This appeal followed.

The plaintiff's first assignment of error is that the trial court improperly admitted extrinsic evidence relative to the parties' understanding of paragraph 7L, and the object they intended thereby, in violation of the parol evidence rule. Pointing to the court's finding that the provision is unambiguous on its face, the plaintiff asks us to rule that its plain meaning must be given effect.

In this State, antenuptial agreements are governed by the same rules of construction as apply to other contracts, and accordingly, the proper interpretation of an antenuptial agreement is one that speaks to the intention of the parties at the time they enter the contract. *See Griswold v. Heat Corporation*, 108 N.H. 119, 123, 229 A.2d 183, 186 (1967). Thus, where an agreement is ambiguous, and susceptible to different interpretations, a court may search for the interpretation which best reflects the parties' intention. *Thiem v. Thomas*, 119 N.H. 598, 602, 406 A.2d 115, 118 (1979). But, where the parties to an antenuptial agreement do not leave uncertain their mutual intent, there is no ambiguity, and no occasion for construction. Here, paragraph 7L is perfectly clear; there is no uncertainty as to what a reasonable person in the parties' position would have meant by its terms, and its plain meaning cannot be contradicted by parol evidence. We conclude, as we must, that the court erred in admitting evidence concerning the parties' antecedent understandings of paragraph 7L.

The next question, then, is whether the trial court's ruling was predicated upon the improperly admitted parol evidence, so that a different ruling would have ensued if the evidence had been excluded. We begin our analysis of this issue by a review of the

trial court's findings, as set forth in its decree. First, the court found that paragraph 7L, as read by the plaintiff, "flies so plainly in the face of common sense that the defendant is not required to dispute its meaning." Second, the court ruled that paragraph 7L, as read by the plaintiff, is "void as against public policy." The logical inference that can be drawn from these findings is that the court accorded little weight, if any, to the parol evidence introduced, finding the clause repugnant to public policy, and void on those grounds alone. In short, the trial court did not need to look beyond the plain meaning of paragraph 7L because it found the provision void on its face. Consequently, the plaintiff was not prejudiced by the admission of parol evidence, and the effect of the trial court's error was harmless.

Having determined that the trial court rested its ruling upon public policy, we must next consider whether paragraph 7L is unenforceable on those grounds. Divorce, historically, was a remedy for a wrong, available only to an innocent spouse. However, with the advent of irremediable breakdown grounds for divorce, fault ceased to be the necessary focus of a dissolution proceeding. C. DOUGLAS, 3 NEW HAMPSHIRE PRACTICE, FAMILY LAW § 165, at 147 (1982). RSA 460:2-a, authorizing antenuptial agreements, is further legislative recognition that parties may obtain a divorce, and contract regarding the financial incidents of divorce, without regard to the relative moral rectitude of either spouse.

To summarize, RSA 460:2-a allows couples to alter the ordinary legal incidents of divorce, and determine their own destinies, without regard to fault. Curiously, however, the contract of the parties here does not eliminate fault as a consideration. Instead, paragraph 7L explicitly anticipates the possibility of fault by extinguishing the parties' mutual promises under the agreement if the husband disregards his marriage vows and leaves his wife for another woman. In that event, paragraph 7L relieves the parties from their agreement, leaving it to a court to determine matters such as alimony and support.

Initially, we note that our cases have not yet set the standards of fairness by which the validity of antenuptial agreements should be determined. We proceed, accordingly, to address this threshold issue. Courts uniformly agree that antenuptial agreements are subject to ordinary principles of contract law. However, the State has a special interest in the subject matter of antenuptial agreements, and as a result, courts tend to scrutinize these agreements more closely than ordinary commercial contracts. *See generally* Younger, *Perspectives on Antenuptial Agreements*, 40

RUTGERS L. REV. 1059, 1061–65 (1988). Typically, courts uphold antenuptial agreements if three standards of fairness are met: (1) the agreement was not obtained through fraud, duress or mistake, or through misrepresentation or nondisclosure of a material fact; (2) the agreement is not unconscionable; (3) the facts and circumstances have not changed since the agreement was executed so as to make the agreement unenforceable. *See, e.g., Brooks v. Brooks,* 733 P.2d 1044, 1049 (Alaska 1987); *DeLorean v. DeLorean,* 211 N.J. Super. 432, 436–38, 511 A.2d 1257, 1259–60 (1986); *Scherer v. Scherer,* 249 Ga. 635, 641, 292 S.E.2d 662, 666 (1982).

■ Thus, even though RSA 460:2-a invests antenuptial agreements with a presumption of validity, we hold that this presumption can be rebutted if the party seeking invalidation of the agreement proves that one or more of the above enumerated standards of fairness have not been met. In the case before us, we make no inquiry regarding the enforceability of the parties' agreement under the first criterion, because neither challenges the agreement on the ground of procedural unfairness. Instead, our inquiry focuses on the substantive fairness of the agreement, and addresses the question of conscionability.

In determining the conscionability of antenuptial agreements, courts naturally differ as to what justifies judicial rescission or cancellation. In some jurisdictions, agreements conferring a substantial economic advantage upon dissolution, irrespective of fault, are said to encourage profiteering by divorce, and are deemed unconscionable and void as against public policy. *See Gross v. Gross,* 11 Ohio St. 3d 99, 105, 464 N.E.2d 500, 506 (1984); *McHugh v. McHugh,* 436 A.2d 8, 12 (Conn. 1980). Some courts find that when a spouse surrenders all rights to alimony and support, the resulting forfeiture is unconscionable and contrary to public policy as tending to facilitate or induce separation and divorce. *See Eule v. Eule,* 24 Ill. App. 3d 83, 88, 320 N.E.2d 506, 510 (1974). Following this reasoning, other courts find that if one spouse is encouraged to divorce by the financial provisions in an antenuptial agreement, the other spouse is, to a similar extent, deterred. *See Norris v. Norris,* 174 N.W.2d 368, 370–71 (Iowa 1970). In those jurisdictions, forfeiture provisions raise the concern that a spouse will be forced to endure marital misconduct constituting fault grounds for divorce; *i.e.,* an innocent spouse, harboring well-founded uncertainties as to the faithfulness of her husband, will be reluctant to take legal action if commencement of a dissolution proceeding would deprive her of all means of support. *Id.* Still other jurisdictions refuse to intrude upon the right of competent parties to contract,

and hold the parties to their bargain in the absence of untoward circumstances. *See McKee-Johnson v. Johnson*, 444 N.W.2d 259, 266–67 (Minn. 1989); *Herget v. Herget*, 77 Md. App. 268, 276, 550 A.2d 382, 385–86 (1988); *Gant v. Gant*, 329 S.E.2d 106, 116 (W. Va. 1985).

Turning to the antenuptial agreement at hand, we find no indication that literal enforcement of paragraph 7L would cause either party to forfeit the right to support, or endure a similar hardship. To the contrary, paragraph 7L operates to abrogate the agreement entirely, entitling the parties to a court's determination of property distribution and maintenance if the husband abandons his marriage for a new relationship. Thus, although the trial court condemned paragraph 7L in the name of public policy, the clause in effect causes the financial incidents of the parties' divorce to be determined precisely according to the public policy of this State, as set forth by the statutory law governing marital dissolution. Although it is true that public policy frowns upon adultery, it is difficult to see how public policy is offended under these circumstances. Indeed, the invocation of a court's discretion could result in a substantial financial penalty to the errant spouse, if divorce is predicated on fault grounds.

■ Accordingly, we do not agree with the trial court's ruling that "the plaintiff cannot take advantage of paragraph [7L]." The parties did not agree that fault on the part of the plaintiff would vitiate the terms of paragraph 7L at the defendant's option, and the court may not substitute its judgment to reach this result even if the contract, as written, appears to be an imprudent one. We therefore conclude our conscionability review of paragraph 7L by upholding its validity.

■ Having determined the validity of paragraph 7L, we next consider whether the plaintiff is entitled to invoke the clause and avoid the agreement. In deciding this issue, we turn first to the trial court's findings of fact. The trial court found that no credible evidence was produced by the plaintiff which could support a finding that he left his wife for reasons other than irreconcilable differences. The court's findings point out that the plaintiff did not meet his new love, "Talk," until eight months after he disappeared, without explanation, on Christmas night. Without belaboring the issue, we agree that on the record before us there is no evidence that the plaintiff's new relationship caused the breakdown of his marriage. Accordingly, the plaintiff was not entitled to invoke paragraph 7L, and the trial court was correct in refusing to void the antenuptial agreement.

The plaintiff's third contention is that the trial court erred in strictly enforcing the antenuptial agreement. Arguing that circumstances have changed since the inception of the contract, the plaintiff suggests that literal construction of its terms would work an injustice warranting modification. Specifically, the plaintiff asks the court to find that he was compelled to take an early retirement due to a worsening medical condition which has left him disabled. He seeks to invoke paragraph 7C of the antenuptial agreement, which operates under certain circumstances to reduce the support payments promised in other provisions of the contract. Conveniently, however, he overlooks the fact that the reduction of payments contemplated by paragraph 7C is subject to an explicit condition precedent: he must be receiving disability payments from his employer. Notwithstanding the plaintiff's non-receipt of such benefits, he contends that his early retirement alone justifies relief from the support obligations under the contract.

In essence, then, the plaintiff asks us to review the antenuptial agreement by applying the third standard of fairness set forth above, which invalidates an agreement if circumstances are so changed since its execution that enforcement would shock the conscience of the court. Because ensuring predictability of wealth distribution is typically the object of an antenuptial agreement, we note the tension between this retrospective inquiry and the interest of the parties in controlling their own financial affairs. We recognize, moreover, that many courts refuse to apply hindsight in determining the validity of an agreement, and insist that parties live with their bargain if it was fair when struck. *See Simeone v. Simeone*, 551 A.2d 219, 223 (Pa. Super. 1988); *Herget v. Herget*, 77 Md. App. at 275–76, 550 A.2d at 385–86. However, when the status of a spouse would change so dramatically as a result of divorce that enforcement of an antenuptial agreement would result in the spouse becoming a public charge, we believe that the State's interest in protecting the welfare of the spouse, and mitigating the hardship occasioned by divorce, compels judicial reformation of the contract. *See Newman v. Newman*, 653 P.2d 728, 735 (Colo. 1982); *Gross v. Gross*, 11 Ohio St. 3d 99, 109, 464 N.E.2d 500, 509 (1984); *Lewis v. Lewis*, 748 P.2d 1362, 1367 (Hawaii 1988).

Thus, we join those courts which, for public policy reasons, recognize that an agreement once fair and reasonable may become so one-sided by the time of dissolution that its application to a spouse would be unconscionable. *Id.*; *see also McKee-Johnson v. Johnson*, 444 N.W.2d 259, 266 (Minn. 1989); *cf. Perry v. Company*, 99 N.H. 451, 453, 114 A.2d 885, 887 (1955). While we acknowledge

the right of parties to contract in their own perceived best interests, we hold that this right is not absolute, but is subject to the right of the court to mitigate the effect of unforeseen economic hardship. We conclude that provisions in an antenuptial agreement may lose their validity by reason of changed circumstances so far beyond the contemplation of the parties at the time they entered the contract that its enforcement would work an unconscionable hardship.

We agree with the trial court, however, that no such hardship exists in the case at hand. The trial court found that the plaintiff's health problems were foreseen at the time of contracting, as the parties explicitly provided for them in the written agreement. Additionally, the court found that despite his pleas of poverty, the plaintiff stands to gain a retirement settlement of approximately $450,000 when his divorce is finalized. In light of the facts found by the trial court, and our own review of the record in this case, we hold that the provisions for support and maintenance disputed by the husband are not unconscionable as a matter of law. We therefore affirm the trial court's decision.

*Affirmed.*

All concurred.