In re the MARRIAGE OF Sharon A. CONNER, Appellant–Petitioner,

and

Robert A. Conner, Appellee–Respondent.

No. 02A03–9810–CV–438.

Court of Appeals of Indiana.

July 7, 1999.

Eric E. Snouffer, Snouffer & Snouffer, Fort Wayne, Indiana, Attorney for Appellant.

Donald C. Swanson, Swanson & Campbell, Fort Wayne, Indiana, Attorney for Appellee.

## OPINION

KIRSCH, Judge

Sharon Conner appeals the trial court's judgment dissolving her marriage to Robert Conner. The parties present four issues for review:

I. Whether the trial court erred in its construction and application of the parties' antenuptial agreement;

II. Whether there was sufficient evidence to support the trial court's determination of the value of Robert's business;

III. Whether the trial court abused its discretion in offsetting maintenance payments against Sharon's portion of the property division; and

IV. Whether the trial court abused its discretion by valuing Robert's IRA account as of the separation date rather than the hearing date.

We reverse the trial court's judgment on Issue II. We affirm on all other issues.

## FACTS AND PROCEDURAL HISTORY

When Robert and Sharon married in 1981, Robert was a radiologist serving as the president of his radiology practice group. Robert and Sharon signed an antenuptial agreement declaring that the assets brought into the marriage would not be subject to property division in the event of a divorce. The agreement further provided a formula for dividing assets acquired during the marriage.

In 1991, Robert left the radiology group and started his own practice, Associated Imaging, Inc. In February 1997, the parties separated. Sharon withdrew $40,000 from the parties' line of credit account, then filed for divorce. The parties negotiated a maintenance agreement that required Robert to repay the $40,000 debt in monthly payments of $3,000 in lieu of maintenance payments. The trial court increased the amount to $4,500 per month as of August 1997. By December 1997, the maintenance credits had fulfilled the loan amount, and Robert began to pay $4,500 per month in maintenance directly to Sharon.

The trial court held a dissolution hearing in June 1998. At the hearing, Robert contended that Associated Imaging and his individual retirement account at McDonald & Co. (IRA) should not be counted as marital assets because they were excluded by the antenuptial agreement. Sharon contended that both assets should be in the marital pot, including appreciation in the assets after the parties separated. She presented an expert witness who valued Associated Imaging at $480,000 as of December 1997. The trial court agreed that Associated Imaging was a marital asset but reduced the valuation to $144,000. The court also included the IRA as a marital asset but declined to include appreciation. The court then divided the property using the formula in the antenuptial agreement and reduced Sharon's portion by $67,500 attributable to maintenance payments.

## DISCUSSION AND DECISION

### I. Standard of Review

 The trial court entered special findings of fact and conclusions thereon in accordance with Indiana Trial Rule 52(A). When a trial court enters special findings and conclusions, the court on appeal considers whether the findings support the conclusions and whether the conclusions support the judgment. *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996). Absent clear error, the judgment must be affirmed. *Id.* Further, when reviewing a property division, this court considers only the evidence most favorable to the trial court's decision. *Fields v.*

*Fields*, 625 N.E.2d 1266, 1267 (Ind.Ct.App. 1994), *trans. denied.* If the trial court's decision is consistent with the logic of the evidence, we must affirm. *Nill v. Nill*, 584 N.E.2d 602, 603–04 (Ind.Ct.App.1992), *trans. denied.* If, however, the trial court's decision is clearly against the logic and effect of the law, facts and circumstances, the decision must be reversed. *Hodowal v. Hodowal*, 627 N.E.2d 869, 871 (Ind.Ct.App.1994), *trans. denied.*

## II. Antenuptial Agreement

On appeal, both Robert and Sharon accept the antenuptial agreement as valid and unambiguous. Each, however, contends that a different section of the agreement controls the dispute in this case. Robert contends that Section 1 of the agreement controls, and argues that the trial court erred in interpreting and applying that section. Section 1 reads:

> "1. *PROPERTY COVERED:* The property [listed on attached schedules], ... *any property they may hereafter acquire* ... (including Husband's ... pension and or profit-sharing plan with CFB Radiology, Inc. ...) ... *or any other property or interests in property owned by each party* shall be owned as separate property of each party during marriage, except as elsewhere provided herein. Each party waives, discharges and releases all right, title and interest in and to the property of the other party presently owned or hereafter acquired."

*Record* at 194 (emphasis added). According to Robert, any property titled in his name alone should be excluded from the marital pot. As such, Robert contends that the trial court erred by including the Associated Imaging business as a marital asset.

Sharon counters by referencing Section 2 of the agreement, which, she maintains, requires inclusion of the Associated Imaging business as marital property. She argues that the Section 1 exclusion provisions do not apply to the "marital increment" defined in Section 2. That section reads:

> "2. *CLAIMS COVERED—DISSOLUTION OF MARRIAGE*

In the event the parties should separate within any of the following periods, after their marriage, which separation should culminate in their dissolution of marriage, then Wife shall be entitled to the following percentage of the "marital increment" as hereinafter defined ... [If separation occurs after five years of marriage, wife is entitled to 50% of the Marital Increment.]

The 'Marital Increment', as hereinabove referred to, is defined as: The collective and cumulative net worth (without regard to whether property is owned jointly, severally or individually ... ) existing on the date of separation, excluding all of Husband's pre-marital and post-marital contributions to a pension and/or profit-sharing plan with CFB Radiology, Inc. and/or his successor employer ..., also excluding Husband's ownership interest in any stock in the Duemling Medical Building ..., less the collective net worth of the parties cumulatively [prior to the marriage]."

Record at 194–95(emphasis added).

 General principles of contract law govern the parties' antenuptial agreement. See Boren and Boren, 475 N.E.2d 690, 693 (Ind.1985) (antenuptial agreements are legal contracts). This court must apply the provisions according to their plain and ordinary meaning. Harlan v. Harlan, 544 N.E.2d 553, 557 (Ind.Ct.App.1989) aff'd 560 N.E.2d 1246 (Ind.1990). In Section 1, each party waives all rights to the other's individually held property except as provided elsewhere in the Agreement. Section 2 modifies Section 1 by creating the "Marital Increment"— defined as the collective net worth of the parties at the time of separation less the collective and cumulative net worth of the parties prior to the marriage, without regard to whether the property is individually owned. Section 2 requires that the Marital Increment be divided equally between the parties if they separate after five or more years of marriage.

The two provisions together create a marital pot consisting of certain property acquired during the marriage, including the Associated Imaging business. Section 2 thus requires that Sharon receive one-half of the value of Associated Imaging (after setoffs and other adjustments discussed infra).[1] The trial court did not err by including Associated Imaging as a marital asset.

### III. Value of Associated Imaging

Both parties challenge the trial court's valuation of Associated Imaging at $144,000. Sharon contends that the court should have accepted the valuation presented by her expert witness, while Robert contends that the expert's valuation grossly overstates the business' worth. The trial court adopted the method presented by Sharon's expert, but found that the expert had incorrectly included the business' 1997 income in the valuation. Based on that finding, the trial court recalculated the valuation without the 1997 income. The court then further reduced the valuation by "applying a standard 20% lack of marketability discount." Record at 178.

We first address Robert's challenges to the trial court's valuation. Robert claims that the business has a negative net worth. He asserts that Sharon's expert improperly incorporated future earnings into the valuation and failed to consider obsolescence of the business' medical equipment. Robert also asserts that the valuation failed to discount the accounts receivable for defaults and for health maintenance organization contracts. Robert contends that the trial court should have adopted his accountant's assessment of the value of the business rather than accepting the method used by Sharon's expert.

The accountant's assessment of the business, however, was not a valid valuation. The assessment is contained in a letter which outlined the business assets and liabilities. In the letter, the accountant concluded that the business had a negative net asset value, but expressly stated that his letter "should not be looked upon as a business appraisal." Record at 414. The accountant offered no conclusion on the value of the business. Rather, he merely wrote: "I feel that the only worth the corporation has is its $213,000

---

1. This application of the Agreement is consistent with the recitations contained in its opening paragraphs. In those recitations, each party acknowledged that the assets the other brought into the marriage would remain the other's property. Record at 193.

net operating loss carryover, and its corporate structure, including staff." *Record* at 414. This statement was not sufficient to support a business valuation.

Robert's challenge to the expert's method, however, has some merit in light of our supreme court's recent decision in *Yoon v. Yoon*, 711 N.E.2d 1265 (1999). In *Yoon*, the court recognized a distinction between enterprise goodwill and personal goodwill when valuing a medical practice in a dissolution action. 711 N.E.2d at 1268–1269. Personal goodwill, the court explained, "represents nothing more than the future earning capacity of the individual." 711 N.E.2d at 1269. As such, the court continued, business value that is attributable to personal goodwill cannot be included in a business valuation for dissolution purposes. *Id.* The court in *Yoon* remanded the case to the trial court for a determination of the medical practice value attributable to enterprise goodwill versus personal goodwill.

Here, the expert's valuation of Robert's business did not distinguish between enterprise goodwill and personal goodwill. The expert's report indicated that the business is a "referral-based practice" warranting a capitalization rate greater than twenty percent. *Record* at 417 (Green Report at 7). This reference suggests that the expert was assigning a value to the personal goodwill attributable to Robert. Conversely, the expert's report also stated that the "calculated value of professional goodwill [was] added to the adjusted net assets of the practice to arrive at the overall value of the practice." *Record* at 417 (Green report at 7). This reference suggests that the expert was placing a value on enterprise goodwill. Because the expert's valuation does not distinguish between enterprise and personal goodwill, and because the *Yoon* decision requires such a distinction, we must remand for a clarification or redetermination of the value of Associated Imaging.

Given the need to remand, Sharon's challenges to the trial court's decision may become moot. Nonetheless, to avoid unnecessary further appeals, we will address those challenges. Sharon contends that the trial court lacked a sufficient evidentiary basis to alter her expert's valuation figure. We find the evidence sufficient with regard to the valuation itself, but insufficient with regard to the "marketability discount" calculated by the trial court.

The expert testified that he calculated the business value using a formula that combined the business' net assets with the ability to generate income. *Record* at 454. Regarding the valuation date, the expert testified that his method would produce the same business value whether the date of valuation was February 1997 or December 31, 1997. *Record* at 456–57. He explained that he used the post-separation 1997 monthly income figures to represent the ability of the business to generate income.

The trial court rejected the expert's explanation of the need to use the 1997 income figures and recalculated the business value without the 1997 figures. This recalculation was a valid method of adjusting the valuation to reflect only the income figures through the separation date. A trial court has discretion to select the date on which assets are to be valued. *Knotts v. Knotts*, 693 N.E.2d 962, 968–69 (Ind.Ct.App.1998). Our supreme court has determined that the trial court's decision concerning the valuation date is entitled to significant deference. *Quillen*, 671 N.E.2d at 103 ("The selection of the valuation date for any particular marital asset has the effect of allocating the risk of change in the value of that asset between the date of valuation and date of the hearing. We entrust this allocation to the discretion of the trial court."). Here, the trial court adopted the expert's methodology and properly substituted income figures that were available on the separation date. The evidence supported the trial court's calculations.

In contrast, the trial court's use of a "marketability discount" is unsupported by the evidence. As Sharon points out, the Record contains no evidence of a percentage discount for marketability, nor of a "standard marketability discount."[2] The trial court

2. Robert's counsel's reference to a 20% HMO discount for accounts receivable is immaterial

thus must have intended to take judicial notice of the marketability discount. The existence or amount of a marketability discount, however, is not a fact open to judicial notice. As defined in Ind. Evidence Rule 201(a), a judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Although there are ample examples in the body of law concerning application of a marketability discount,[3] a search of recent opinions yielded no case in which a court had applied a discount without some testimony concerning the amount or validity of such a discount. Further, we cannot definitively state that application of a 20% marketability discount for the value of a health care business is a generally known fact.[4] Accordingly, we find the evidence insufficient to apply a 20% marketability discount in the valuation of Associated Imaging.

## IV. Maintenance Payments

In calculating the property judgment, the trial court gave Robert a credit of $67,500 for maintenance he had paid to Sharon. *Record* at 180. According to the court's findings, the $67,500 figure represented maintenance paid "*since* December 15, 1997." *Record* at 178 (emphasis added). However, the Record and the parties' stipulations indicate that the *entire* amount of maintenance paid was $67,500.[5] Of this $67,500, the parties treated the first $40,000 as a credit against the loan Sharon took out on the parties' line of credit. The parties now dispute whether any of these amounts should be offset against Sharon's property judgment.

Sharon argues that the parties' pretrial stipulation established that the maintenance payments would not be offset against the property judgment. She relies on the following provision in the stipulation:

> "As a part of these proceedings, Robert and Sharon, through their attorneys, entered into a maintenance agreement by the terms of which Sharon would receive a credit of $3,000.00 per month, commencing February 1, 1997, as maintenance as against a sum of $40,000.00 which she had withdrawn from a line of credit loan maintained by the parties at Merrill Lynch, Fort Wayne, Indiana. Robert agreed to repay the said loan and Sharon was to be charged with only that amount of the $40,000 remaining at the time of dissolution."

*Record* at 112. Sharon points out that the maintenance credits covered the entire $40,000 as of December 15, 1997. She concludes that there should be no offset against her portion of the property judgment.

Robert argues that the antenuptial agreement requires the entire maintenance payment to be set off against Sharon's judgment. The pertinent portion of the agreement states: "Any amounts paid or property transferred/set-off to Wife under any such [dissolution of marriage] proceeding shall be credited against Wife's said entitlement to the aforesaid marital net worth increment." *Record* at 195. Robert further argues that he reserved his rights under the antenuptial agreement when he agreed to make the maintenance payments, citing letters from

(*Record* at 60–61); the reference does not address marketability nor is it admissible evidence.

3. *See e.g., Batt and Batt,* 149 Or.App. 517, 945 P.2d 517 (Or.Ct.App.1997); *Nelson v. Nelson,* 411 N.W.2d 868 (Minn.Ct.App.1987).

4. Even if a 20% marketability discount were appropriate for certain closely held businesses, we cannot apply such a discount to a health care business without some evidence of marketability relevant to the mergers and reorganizations occurring in health care within the past decade.

5. The parties variously identify the maintenance payments as $67,000 (Robert's Brief at 21), $67,500 (Robert's Brief at 27), and $40,500 (Sharon's Reply Brief at 15). Based on the information we can glean from the Record, the total maintenance calculation is:

| | |
|---|---|
| $18,000 | ($3,000/mo × 6 mo (Feb.—July 1997) credited by parties' stipulation) |
| $22,000 | ($4,500/mo × 4½ mo (Aug.—Dec. 15 1997) credited by court modification order) |
| $27,500 | ($4,500/mo × 6½ mo (Dec. 15 1997—June 1998) paid by court modification order) |
| $67,500 | |

his attorney that confirm the maintenance agreement. *Record* at 430–31, Exhibit P.

We find that the antenuptial agreement controls the maintenance setoff. The stipulation is silent with regard to the antenuptial agreement, so the agreement remains in force. The agreement requires that maintenance payments be credited against Sharon's portion of the property judgment; nothing in the stipulation contradicts that requirement. Accordingly, the trial court properly offset the $67,500 maintenance payments against Sharons's portion of the marital property.

## V. IRA Account

The trial court valued Robert's IRA account at McDonald & Co. at $1,048,086 as of December 1996, the year-end prior to the parties' separation. The parties stipulated that after the separation, the account value increased by $285,942 due to dividend and interest income. Sharon argues that the trial court should have included the IRA appreciation in the marital pot.

 Robert maintains that the trial court erred by deeming the IRA a marital asset for purposes of calculating the property division. According to Robert, the antenuptial agreement precludes inclusion of that IRA in the marital pot. In the alternative, Robert argues that if the IRA is a marital asset, the trial court properly valued it as of the separation date.

Robert's first argument fails, because the antenuptial agreement excludes only contributions to the IRA. *Record* at 194. The antenuptial agreement is silent with regard to earnings. As such, the trial court properly excluded the contributions to the IRA but included the IRA earnings.

The trial court also correctly valued the IRA earnings for the purpose of the property disposition. As noted *supra,* a trial court has discretion to determine the valuation date for marital assets. Here, the court reasonably determined that the IRA should be valued as of the date of separation. The cases cited in Sharon's briefs do not mandate the later valuation date. Those cases, *Adams and Adams,* 535 N.E.2d 124 (Ind. 1989) and *Tirmenstein v. Tirmenstein,* 539 N.E.2d 990 (Ind.Ct.App.1989), stand for the

proposition that certain portions of pension accounts may be included among marital assets. Neither case requires that post-separation IRA accretions be included in the property disposition order. Thus, the trial court was within its discretion in valuing the IRA as of the year-end prior to the separation date.

Affirmed in part, reversed in part and remanded for a valuation of Associated Imaging consistent with the supreme court's decision in *Yoon v. Yoon,* 711 N.E.2d 1265 (1999), and with this opinion.

GARRARD, J., and NAJAM, J., concur.