# MELINDA CREWS *v.* STEPHEN CREWS
## (SC 18176)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

154

Argued October 22, 2009—officially released March 16, 2010

*Charles D. Ray,* with whom was *Matthew A. Weiner,* for the appellant (plaintiff).

*George J. Markley*, with whom was *Michael A. Meyers*, for the appellee (defendant).

*Jane K. Grossman, Kevin M. Barry* and *Jyll L. Lyone*, certified legal intern, filed a brief for the Connecticut Women's Education and Legal Fund et al. as amici curiae.

*Opinion*

VERTEFEUILLE, J. In this certified appeal, the plaintiff, Melinda Crews, appeals from the judgment of the Appellate Court reversing in part the judgment of the trial court with regard to certain financial orders included in the dissolution of her marriage to the defendant, Stephen Crews. *Crews* v. *Crews*, 107 Conn. App. 279, 945 A.2d 502 (2008). On appeal to this court, the plaintiff first claims that the Appellate Court improperly applied a plenary standard of review to the trial court's conclusion that the antenuptial agreement between the parties was unenforceable. Rather, the plaintiff claims that the Appellate Court should have applied an abuse of discretion standard to review the trial court's judgment. The plaintiff further claims that even if the Appellate Court correctly employed a plenary standard, it improperly applied that standard to the facts of the present case. The defendant responds that the Appellate Court correctly applied plenary review in concluding that the parties' antenuptial agreement was enforceable. We agree with the defendant, and, accordingly, we affirm the judgment of the Appellate Court.

The Appellate Court majority opinion summarized the following relevant facts as found by the trial court: "The parties met at a corporate outing when they both were employed by the General Electric Corporation (General Electric). At the time, the defendant was the divorced father of three children. The plaintiff had not been married previously. The defendant holds a bachelor's degree; the plaintiff has bachelor's and master's

degrees. The defendant was then residing in the future marital home, a house that he had purchased from his mother in an arm's-length transaction on December 31, 1986. The plaintiff owned a condominium unit in Bridgeport. At the time, each of the parties had bank accounts, pension plans and investments.

"The parties became engaged in January, 1988, and were married on June 25, 1988. About one year prior to their wedding, the defendant raised the subject of an antenuptial agreement. The defendant believed he had been 'burned' in his previous divorce and declared: 'No agreement; no wedding!' The plaintiff told the defendant that she was 'no fan [of an antenuptial agreement], but agreed with him in concept.' The defendant described the agreement as a precondition to the wedding itself and presented the plaintiff with a draft of the agreement on May 31, 1988. The parties signed the agreement on June 24, 1988, one day before they were married.

"Following their marriage, the parties resided in the marital home and had two children, a daughter born in May, 1989, and a learning disabled son born in May, 1992. Both parties were employed during their marriage, and initially each of them traveled extensively in connection with his or her employment. At the time of [the dissolution] trial, the defendant had been employed by General Electric for thirty-nine years, where he earned an annual base salary of $131,000 and regularly received annual bonuses. His annual net income was $98,540 at the time of dissolution. The [trial] court made no finding that the nature of the defendant's employment changed during the marriage from what it had been prior to the marriage. During the marriage, he also acquired General Electric stock and stock options, some of which was encumbered by margin loans. He also participated in two executive compensation plans in the 1990s.

"The plaintiff was fifty-three [years old] at the time of dissolution [in 2005]. From 1981 through 1986, she was a technical writer for General Electric, earning $50,000 per year. She left General Electric to join Practice Media and later the NYNEX Corporation. She worked steadily during the marriage, except for a three month maternity leave she took following the birth of each child. After the birth of the parties' children and an automobile accident, the plaintiff decided that corporate travel was too much for her in addition to her responsibilities at home. In 1993, she formed her own business known as M. Crews & Company, LLC, which she operated out of the marital home until just prior to trial. The value of the plaintiff's business then was about $96,000, and she had an annual net income of $69,056." Id., 282–84.

The plaintiff filed her dissolution action in May, 2004. In her complaint, the plaintiff requested alimony, assignment of the marital home, an equitable division of marital assets and attorney's fees. In response, the defendant filed a cross complaint in which he sought enforcement of the antenuptial agreement, which he claimed established the appropriate financial determinations upon dissolution. The antenuptial agreement precluded the trial court from awarding the plaintiff alimony, a share in the marital home, a portion of the defendant's retirement and investment assets and attorney's fees.

Following a trial in June, 2005, the trial court rendered a judgment of dissolution, but refused to enforce the terms of the antenuptial agreement. The trial court determined that the antenuptial agreement was not governed by the provisions of the Connecticut Premarital Agreement Act (act),[1] General Statutes § 46b-36a et seq.,

---

[1] The act provides, inter alia, that a premarital agreement is not enforceable against a party if that party proves one or more of several conditions: the agreement was not entered into voluntarily; the agreement is unconscionable; the parties did not fairly and reasonably disclose financial assets or obligations prior to signing the agreement; or the complaining party did not

presumably because the act applies only to antenuptial agreements entered into on or after October 1, 1995; General Statutes § 46b-36a; and the parties had entered into their agreement on June 24, 1988. The trial court concluded, instead, that the antenuptial agreement was governed by the equitable rules established in *McHugh* v. *McHugh*, 181 Conn. 482, 436 A.2d 8 (1980).

The trial court concluded that enforcing the antenuptial agreement would be unjust under *McHugh*. It determined that a dramatic change in the parties' economic circumstances had occurred between the time that the agreement was executed and the time of the dissolution proceedings, which rendered enforcement of the antenuptial agreement inequitable. The trial court therefore ordered the defendant to make the following payments to the plaintiff: monthly alimony of $1000 until the death of either party, the plaintiff's remarriage, or August 31, 2010, whichever occurs first; $450,000 to compensate the plaintiff for her contribution to the appreciation in value of the marital home and for her share of the defendant's pension and investment accounts; and $25,000 for her attorney's fees.

The defendant appealed from the judgment of the trial court to the Appellate Court, claiming that the trial court, inter alia, improperly had failed to enforce the antenuptial agreement. *Crews* v. *Crews*, supra, 107 Conn. App. 281. The Appellate Court majority, applying a plenary standard of review, concluded that the trial court incorrectly had applied the *McHugh* factors in determining that the antenuptial agreement was unenforceable and "reverse[d] that portion of the judgment requiring the defendant to pay the plaintiff time limited alimony, attorney's fees, a lump sum property settle-

have a reasonable opportunity to consult with independent counsel. General Statutes § 46b-36g (a); see *Friezo* v. *Friezo*, 281 Conn. 166, 182, 914 A.2d 533 (2007).

ment and a portion of his pension and investments." Id., 299. In his dissent, Judge Gruendel concluded that the Appellate Court majority should have applied an abuse of discretion standard in its review of the trial court's judgment, and, further, that it should have affirmed that judgment. Id., 317. This certified appeal followed.[2] Additional facts and procedural history will be provided as necessary.

We begin our analysis with a brief overview of our common law governing antenuptial agreements. In *McHugh* v. *McHugh*, supra, 181 Conn. 486, this court explicitly determined that "[a]n antenuptial agreement is a type of contract and must, therefore, comply with ordinary principles of contract law." The court specifically noted that "antenuptial agreements are to be construed according to the principles of construction applicable to contracts generally." Id., 491.[3] Although

[2] We granted the plaintiff's petition for certification to appeal from the Appellate Court limited to the following issues: (1) "Did the Appellate Court properly apply a plenary standard of review to the trial court's conclusion that enforcement of the parties' antenuptial agreement as of the date of dissolution would work an injustice?" (2) "Even if the Appellate Court properly applied a plenary standard of review, did the Appellate Court properly reverse the trial court's judgment that enforcement of the parties' antenuptial agreement as of the date of dissolution would work an injustice?" *Crews* v. *Crews*, 288 Conn. 901, 952 A.2d 809 (2008).

[3] Several other states also view antenuptial agreements as contracts governed by the same principles applied to contracts generally. See, e.g., *Peden* v. *Peden*, 972 So. 2d 106, 110 (Ala. Civ. App. 2007) ("[t]he interpretation of a provision in an antenuptial agreement, like the interpretation of any provision in any contract, is a question of law for the trial court"); *Schwartz* v. *Schwartz*, 183 P.3d 552, 553 (Colo. 2008) ("[t]he antenuptial agreement at issue here is a written contract"); *Gartrell* v. *Gartrell*, 181 Ohio App. 3d 311, 318, 908 N.E.2d 101 ("[a]n antenuptial agreement is a contract entered into between a man and a woman in contemplation, and in consideration of their future marriage"), appeal denied, 122 Ohio St. 3d 1479, 910 N.E.2d 478 (2009); *In re Marriage of Conner*, 713 N.E.2d 883, 886 (Ind. App. 1999) ("[g]eneral principles of contract law govern the parties' antenuptial agreement"); *In re Estate of Stephenson*, 243 Neb. 890, 896, 503 N.W.2d 540 (1993) ("[a]s a contract, an antenuptial agreement is governed by the same principles that are applicable to other contracts"); *MacFarlane* v. *Rich*, 132 N.H. 608, 613, 567 A.2d 585 (1989) ("[c]ourt's uniformly agree that antenuptial

general contract principles apply to antenuptial agreements, this court additionally determined that "[t]he validity of an antenuptial contract depends upon the circumstances of the particular case." Id., 485. This court then established the seminal, three-prong test governing the enforceability of antenuptial agreements in this state: "[a]ntenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) *the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice.*" (Emphasis added.) Id., 485–86.

On appeal, in both the Appellate Court and this court, the parties have not challenged the trial court's conclusion pursuant to *McHugh* that the parties validly entered into the agreement and that the terms of the agreement do not violate state or public policy. See *Crews* v. *Crews*, supra, 107 Conn. App. 288 ("[t]he [trial] court further found that the agreement contains no provision that either shocks the conscience or violates public policy and that it was enforceable at the time of its execution"). Those two issues, therefore, are not in dispute and the present appeal turns on the third prong of the *McHugh* test.

I

The plaintiff first claims that the Appellate Court incorrectly applied plenary review to the trial court's

agreements are subject to ordinary principles of contract law"); *Simeone* v. *Simeone*, 525 Pa. 392, 400, 581 A.2d 162 (1990) (antenuptial agreements are enforceable like other contracts and are examined under same criteria as other contracts).

decision that the antenuptial agreement between the parties was unenforceable. Specifically, the plaintiff contends that the Appellate Court should have reviewed the judgment of the trial court for abuse of discretion because the trial court based its decision on factual and equitable determinations that normally receive abuse of discretion review. The defendant responds that the Appellate Court properly applied plenary review because the trial court's decision was a legal determination governed by principles of contract law, and therefore is appropriately subjected to plenary review. We agree with the defendant.

The Appellate Court majority determined that plenary review was appropriate in this case due to the nature of the *McHugh* analysis. As the majority summarized: "[w]hen an appellant's claim alleges that the facts found by the court were insufficient to support its legal conclusions, we are presented with a mixed question of fact and law to which the plenary standard of review applies. . . . Our task is to determine whether the court's conclusions are legally and logically correct and find support in the facts that appear in the record." (Citations omitted.) Id., 289.

We begin our analysis with our own standard of review. Determining the appropriate standard of review is a question of law, and as a result, it is subject to plenary review. See, e.g., *Fish* v. *Fish*, 285 Conn. 24, 37, 939 A.2d 1040 (2008) (trial court's determination of proper legal standard in any given case is question of law subject to plenary review); *Hartford Courant Co.* v. *Freedom of Information Commission*, 261 Conn. 86, 96–97, 801 A.2d 759 (2002) (same). We thus exercise plenary review of the Appellate Court's determination to apply a plenary standard of review of the trial court's decision in the present case.

As previously set forth herein, this appeal turns on the third *McHugh* prong, namely, whether the circum-

stances at the time of dissolution were so "beyond the contemplation" of the parties at the time the antenuptial agreement was signed that enforcement of the agreement would work an injustice. *McHugh* v. *McHugh*, supra, 181 Conn. 485–86. This inquiry necessitates the determination of the parties' intent at the time they signed the agreement. "The intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Lighthouse Landings, Inc.*, 279 Conn. 90, 109–10, 900 A.2d 1242 (2006). It is well established that "[w]here there is definitive contract language, *the determination of what the parties intended by their contractual commitments is a question of law.*"[4] (Emphasis added.) Id., 109. It is axiomatic that a matter of law is entitled to plenary review on appeal. See, e.g., *Lopiano* v. *Lopiano*, 247 Conn. 356, 363, 752 A.2d 1000 (1998) (matter of law subject to plenary review).

Moreover, "[s]o-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense. . . . [Such questions require] plenary review by this court unfettered by the clearly erroneous standard. . . . When legal conclusions of the trial court are challenged on appeal, we must decide whether [those] . . .

---

[4] Neither party claims that the antenuptial agreement is unclear or ambiguous.

conclusions are legally and logically correct and find support in the facts that appear in the record." (Citation omitted; internal quotation marks omitted.) *Friezo* v. *Friezo*, 281 Conn. 166, 181, 914 A.2d 533 (2007). In conducting an analysis pursuant to *McHugh*, a court must review the factual circumstances at the time the antenuptial agreement was signed and at the time the dissolution is ordered, both of which involve factual inquiries. A court also must ascertain the intent of the parties at the time the antenuptial agreement was signed, which, as set forth previously, is a legal conclusion. If the court finds that the circumstances at the time of dissolution are not so far beyond the contemplation of the parties at the time the antenuptial agreement was written, the antenuptial agreement is enforced as a matter of law. As a result, "[a] less deferential standard [of review] applies . . . [because] the decision of the trial court is based not on an exercise of discretion but on a purported principle of law." (Internal quotation marks omitted.) *Loughlin* v. *Loughlin*, 280 Conn. 632, 641, 910 A.2d 963 (2006). It is settled that "[q]uestions of law and mixed questions of law and fact receive plenary review." *Duperry* v. *Solnit*, 261 Conn. 309, 318, 803 A.2d 287 (2002); see also *Winchester* v. *McCue*, 91 Conn. App. 721, 729, 882 A.2d 143 (applying plenary standard of review to *McHugh*'s third prong), cert. denied, 276 Conn. 922, 888 A.2d 91 (2005).

Whether enforcement of an agreement would work an injustice is analogous to determining whether enforcement of an agreement would be unconscionable. It is well established that "[t]he question of unconscionability is a matter of law to be decided by the court based on all the facts and circumstances of the case. . . . Thus, our review on appeal is unlimited by the clearly erroneous [or abuse of discretion] standard. . . . This means that the ultimate determination of whether a transaction is unconscionable is a question

of law, not a question of fact, and that the trial court's determination on that issue is subject to a plenary review on appeal." (Citations omitted; internal quotation marks omitted.) *Cheshire Mortgage Service, Inc.* v. *Montes,* 223 Conn. 80, 87–88, 612 A.2d 1130 (1992). We therefore conclude that the Appellate Court majority properly applied a plenary standard of review to the trial court's ruling.

The plaintiff nevertheless contends that the abuse of discretion standard is normally employed to review family law matters. Although this is true, the abuse of discretion standard applies only to decisions based solely on factual determinations made by the trial court. See, e.g., *Simms* v. *Simms,* 283 Conn. 494, 502, 927 A.2d 894 (2007) (alimony orders subjected to abuse of discretion review); *Sablosky* v. *Sablosky,* 258 Conn. 713, 721, 784 A.2d 890 (2001) (contempt orders subjected to abuse of discretion review); *Madigan* v. *Madigan,* 224 Conn. 749, 758, 620 A.2d 1276 (1993) (custody orders subjected to abuse of discretion review). When the trial court conducts a legal analysis or considers a mixed question of law and fact, plenary review is appropriate, even in the family law context. See, e.g., *Dutkiewicz* v. *Dutkiewicz,* 289 Conn. 362, 372, 957 A.2d 821 (2008) (claim that parenting order violated parent's right to decision-making authority subject to plenary review because it incorporated statutory interpretation); *Gershman* v. *Gershman,* 286 Conn. 341, 346, 943 A.2d 1091 (2008) ("[a]lthough we generally apply the well settled abuse of discretion standard in domestic relations matters, our review in the present case is plenary because we address the question of what, as a matter of law, constitutes dissipation [of family assets] in the context of a marital dissolution proceeding"); *Montoya* v. *Montoya,* 280 Conn. 605, 612, 909 A.2d 947 (2006) (if antenuptial agreement is "unambiguous within its four corners," parties' intent is question of law necessitating

plenary review). We therefore disagree with the plaintiff's contention that we should employ the abuse of discretion standard.

## II

The plaintiff next claims that even if the Appellate Court properly employed a plenary standard of review, it improperly applied that standard to the facts of the present case. Specifically, the plaintiff contends that the trial court's conclusion that enforcement of the antenuptial agreement would result in an injustice is supported by the evidence in the record. The defendant responds that the Appellate Court correctly applied the plenary standard of review, and, further, that there is insufficient evidence in the record to demonstrate that the change in the circumstances between the parties at the time of dissolution was not contemplated. We agree with the defendant.

The following additional facts and procedural history are relevant to our analysis. The antenuptial agreement between the parties established their financial rights and responsibilities during the marriage, upon dissolution of the marriage, and upon the death of either party. During the marriage, each party was required to maintain continuous, gainful employment and to take all necessary measures to prevent voluntary or involuntary termination of his or her employment. The parties further agreed during the marriage to keep their respective property separate, whether owned prior to the marriage or acquired during the marriage. Each party also relinquished all rights, including all statutory rights and interests, in the other's probate estate.

The antenuptial agreement additionally provided that, in the event of dissolution, neither party would seek or accept any cash, property, alimony, attorney's fees or any other property from the other. In the event of divorce, the parties would be allowed to keep their

separately owned property acquired either before or during the marriage, as well as their share of the marital property. The marital property would be divided in proportion to their respective contribution toward the purchase of that property. Other provisions related to child support and custody, including a provision that in the event of dissolution, child support would be determined on the basis of "the needs and best interest of the child and not as a function of the wealth of the non-custodial parent."

In its memorandum of decision, the trial court determined that the parties' financial circumstances had "changed dramatically" between the time they signed the agreement and the time of the dissolution, thus rendering the agreement unenforceable pursuant to the third prong of *McHugh*. The court reasoned that "the agreement was valid and enforceable at the time of its execution . . . [but] that the evidence supports a finding that the economic circumstances of the parties have changed dramatically between the date of the agreement and the dissolution, in particular the economic circumstances of the [defendant], due in substantial part to the efforts of the [plaintiff], that given the length of the marriage, the birth of two children, and the substantial financial and nonfinancial contributions of the [plaintiff] from employment outside of the home to her parenting and homemaking efforts, it would be inequitable to enforce the terms of the prenuptial agreement of the parties."

The Appellate Court majority disagreed, concluding that "the [trial] court's finding that the changed circumstances were beyond the contemplation of the parties at the time they signed the agreement . . . is not supported by the record." *Crews* v. *Crews*, supra, 107 Conn. App. 292. Rather, the majority noted that "[t]he evidence demonstrates that the parties contemplated the possibility of a divorce proceeding and incorporated provi-

sions in the agreement to cover such an eventuality and agreed on how to protect their respective assets. Furthermore, there is no evidence to suggest that the parties' financial circumstances at the time of [the] dissolution, relatively speaking, were anything other than what they contemplated when they signed the agreement." Id., 293. As the Appellate Court elaborated, "[i]t is apparent that the [trial] court, in rendering its judgment, was moved by equitable considerations codified in our statutes. . . . Those observations, however, have no bearing on whether the agreement should be enforced. . . . In other words, whether the trial court or this court thinks the agreement was a good bargain for the plaintiff does not enter into the analysis of the issue." (Citations omitted.) Id., 296–97. We agree.

We begin with our standard of review. As we concluded in part I of this opinion, the trial court's analysis under *McHugh* involved a mixed question of fact and law. These issues require "plenary review by this court unfettered by the clearly erroneous standard. . . . When legal conclusions of the trial court are challenged on appeal, we must decide whether [those] . . . conclusions are legally and logically correct and find support in the facts that appear in the record." (Citation omitted; internal quotation marks omitted.) *Friezo* v. *Friezo*, supra, 281 Conn. 181. Moreover, "[w]e are mindful that [i]t is well settled that, in a certified appeal, the focus of our review is not on the actions of the trial court, but the actions of the Appellate Court. We do not hear the appeal de novo." (Internal quotation marks omitted.) *State* v. *Morelli*, 293 Conn. 147, 153, 976 A.2d 678 (2009).

We now turn to the text of the third prong of *McHugh*, which provides that "[a]ntenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable

. . . [if] the circumstances of the parties at the time the marriage is dissolved *are not so beyond the contemplation* of the parties at the time the contract was entered into as to cause its enforcement to work injustice." (Emphasis added.) *McHugh* v. *McHugh,* supra, 181 Conn. 485–86. Although we previously have not had occasion to elaborate on the requirements of the third prong of *McHugh,* we now clarify the appropriate analysis. To render unenforceable an otherwise valid antenuptial agreement, a court must determine: (1) the parties' intent and circumstances when they signed the antenuptial agreement; (2) the circumstances of the parties at the time of the dissolution of the marriage; (3) whether those circumstances are "so far beyond" the contemplation of the parties at the time of execution; and (4) if the circumstances are beyond the parties' initial contemplation, whether enforcement would cause an injustice.

The Appellate Court majority correctly determined that the trial court failed to make the requisite findings required by *McHugh* in concluding not to enforce the terms of the antenuptial agreement. As the Appellate Court noted, "[i]t is apparent that the [trial] court, in rendering its judgment, was moved by equitable considerations codified in our statutes. . . . The agreement required the court to adjudicate a contract action in which the traditional notions of equity are not germane because there was an agreement . . . and the evidence does not support a finding that there was a dramatic change in the parties' financial circumstances. . . . In other words, whether the trial court or this court thinks the agreement was a good bargain for the plaintiff does not enter into the analysis . . . ." (Citations omitted.) *Crews* v. *Crews,* supra, 107 Conn. App. 296–97. The Appellate Court thus clearly recognized that the trial court did not make the requisite findings on the parties' intent and whether that intent comported with their

current circumstances, two critical elements of a proper analysis under *McHugh*.

It is additionally clear that the party seeking to challenge the enforceability of the antenuptial contract bears a heavy burden. In explaining the third prong in *McHugh*, this court offered the example that "where the economic status of [the] parties has *changed dramatically* between the date of the agreement and the dissolution, literal enforcement of the agreement may work injustice. Absent such *unusual circumstances*, however, antenuptial agreements freely and fairly entered into *will be honored and enforced by the courts as written*." (Emphasis added.) *McHugh* v. *McHugh*, supra, 181 Conn. 489. This heavy burden comports with the well settled general principle that "[c]ourts of law must allow parties to make their own contracts." *Connecticut Union of Telephone Workers* v. *Southern New England Telephone Co.*, 148 Conn. 192, 201, 169 A.2d 646 (1961). "It is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree." *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 755, 628 A.2d 1298 (1993). "Whether provident or improvident, an agreement moved on calculated considerations is entitled to the sanction of the law . . . ." *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 375, 321 A.2d 444 (1973).[5]

---

[5] The common law of other states is consistent with our conclusion that the party who challenges an antenuptial agreement faces a significant burden. See, e.g., *MacFarlane* v. *Rich*, 132 N.H. 608, 616, 567 A.2d 585 (1989) (recognizing that significant burden is necessary "[b]ecause ensuring predictability of wealth distribution is typically the object of an antenuptial agreement, [which results in a] tension between this retrospective inquiry and the interest of the parties in controlling their own financial affairs"); *Warren* v. *Warren*, 147 Wis. 2d 704, 711, 433 N.W.2d 295 (1988) (The court noted the need for a higher burden on the challenging party because "[t]he idea behind the test is that both spouses have a right to rely upon the prenuptial agreement when all subsequent events transpire as logically anticipated. The premarital agreement is, after all, a contract with all of its attendant risks and risk bearing.").

Although this court previously has not construed the third prong of *McHugh* in any significant manner, precedent from the Appellate Court supports our conclusion that proving uncontemplated, dramatically changed circumstances requires a significant showing. In *Winchester* v. *McCue*, supra, 91 Conn. App. 729–31, the Appellate Court emphasized that *McHugh* requires an "extraordinary change in economic status" and noted "that the threshold for finding such a dramatic change is high." Id., 730. In *Winchester*, the Appellate Court concluded that an alleged 430 percent increase in the value of the defendant husband's estate was *not* beyond the parties' comprehension when they drafted their antenuptial agreement. Id. The court reasoned "that it must have been contemplated by the parties that the defendant would continue working in the corporate arena and that, over the course of years, his income would increase as well as his retirement benefits and investments. *These circumstances do not constitute the type of dramatic or unusual circumstances contemplated by McHugh.*" (Emphasis added.) Id., 731.

In the present case, it is clear that the Appellate Court majority properly recognized and applied the plaintiff's heightened burden. The court concluded that "[p]ursuant to *McHugh* and *Winchester*, which make it clear that the threshold for a finding of dramatic change in circumstances is high . . . not only does the evidence not support the [trial] court's conclusion that there was a dramatic change in the financial circumstances of the parties between the time of their marriage and its dissolution but also [that court's determination] that the financial circumstances that existed at the time of dissolution were well within the contemplation of the parties when they signed the agreement, i.e., that is why the defendant wanted the plaintiff to sign the agreement." *Crews* v. *Crews*, supra, 107 Conn. App. 298.

Moreover, the evidence supports the Appellate Court's conclusion that the circumstances at the time of dissolution were consistent with the parties' expectations and the intended purpose of the antenuptial agreement. Id. For instance, the antenuptial agreement had an express provision affirming the obligation of both parties to remain gainfully employed. In accordance with this obligation, the defendant maintained his employment during the length of the marriage. He therefore continued to receive his salary, bonuses and retirement and investment benefits, all of which continued to increase as he remained employed at General Electric and advanced his career. As the Appellate Court properly noted, "[t]he plaintiff has not argued that the appreciation of the defendant's assets was not in keeping with the economy's growth during the marriage." Id., 294. The court specifically noted that, "[t]he plaintiff has not brought to our attention any evidence that the nature of the defendant's employment changed or that his salary and benefits changed in any fashion other than what one might expect for someone in his position." Id., 295; see also *Winchester* v. *McCue*, supra, 91 Conn. App. 731 (natural increase in assets and wealth from continued employment not uncontemplated change). Thus, the defendant's financial situation at the time of the dissolution was within the realm of the parties' contemplation at the time of execution of the antenuptial agreement.

Moreover, the Appellate Court correctly noted that "[b]y signing the [antenuptial] agreement, the plaintiff also recognized that the defendant desired to segregate all of his property from any interest she may have had in it"; *Crews* v. *Crews*, supra, 107 Conn. App. 293; which included the marital residence. It was an express and intended consequence of the antenuptial agreement, and thus the parties' intent at the time of execution, that the defendant retain full ownership of the marital

residence in the event the marriage was dissolved. The Appellate Court appropriately recognized that any increase in the defendant's equity as a result of his paying the mortgage on the marital home was a natural and probable result of his continued claim to the property. Id., 294. The court correctly pointed out that "the plaintiff agreed to that financial arrangement [of the defendant paying the mortgage while the plaintiff paid daily expenses] knowing full well that the defendant owned the marital home and that the [antenuptial] agreement permitted him to retain it and the rest of his assets should a divorce occur." Id.

The evidence also clearly supports the Appellate Court's refusal to credit the trial court's emphasis on the plaintiff's employment and homemaking efforts. As the Appellate Court summarized: "We also cannot agree [with the trial court's conclusion] that the plaintiff's efforts alone contributed to the increased value of the parties' finances. . . . *Pursuant to the [antenuptial] agreement*, the plaintiff agreed to work throughout the marriage." (Emphasis added.) Id., 296. The antenuptial agreement plainly requires both parties to maintain employment. It further contemplated the birth of children as evidenced by select provisions addressing the amount of maternity leave that the plaintiff would be allowed. Yet, despite its contemplation of the birth of children, the antenuptial agreement clearly intended and required that the plaintiff maintain her employment. It would be inappropriate, therefore, to give the plaintiff additional consideration for fulfilling her contractual obligation.

We conclude that the Appellate Court properly ordered the trial court to enforce the provisions for which the plaintiff contracted. The circumstances of the parties at the time of dissolution accurately reflected their initial intention as expressed in the agreement, namely, two working adults with separate

financial arrangements and assets, each protected from claims by the other. As the antenuptial agreement provides, both the plaintiff and the defendant "[desire] to keep all of [his or her] property, now owned or hereafter acquired, free from any claim that [the other] might otherwise acquire by reason of the marriage, [or] any dissolution thereof . . . ." In the absence of a clear indication that the antenuptial agreement is unenforceable because it was not validly entered into, that it violated public policy, or that it would be unjust to enforce the agreement due to a significant and uncontemplated change in the parties' circumstances; *McHugh* v. *McHugh*, supra, 181 Conn. 485–86; we are unable to rewrite the terms of the contract to which the parties themselves agreed. *Gibson* v. *Capano*, 241 Conn. 725, 732, 699 A.2d 68 (1997) ("[i]t is axiomatic that courts do not rewrite contracts for the parties" [internal quotation marks omitted]).

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.