RENEE WINCHESTER *v.* ROBERT MCCUE
(AC 25293)

Bishop, McLachlan and Harper, Js.

Argued June 2—officially released October 4, 2005

*Campbell D. Barrett*, with whom were *Kevin W. Had-field*, certified legal intern, and, on the brief, *C. Michael Budlong* and *Michael Suppappola*, certified legal intern, for the appellant (defendant).

*Judith A. Ravel*, with whom was *Margot Kenefick Burkle*, for the appellee (defendant).

*Opinion*

McLACHLAN, J. The plaintiff, Renee Winchester, appeals from the judgment of the trial court enforcing a prenuptial agreement executed at her request. The plaintiff argues that the court improperly enforced the prenuptial agreement where (1) the agreement did not constitute a valid contract, (2) the agreement was

unconscionable because the financial situation of the defendant, Robert McCue, at the time of marital dissolution was beyond the contemplation of the parties when the agreement was executed and (3) she is entitled to rescind the agreement because the defendant failed to comply with certain of its terms. The plaintiff also claims that the court made incorrect factual findings so numerous and egregious as to warrant reversal. We affirm the judgment of the trial court.

The plaintiff and the defendant commenced their relationship in February, 1985. At that time, both parties had been widowed and, from their previous marriages, the plaintiff had a minor daughter, then approximately four years old, and the defendant had three older children.

Both parties testified that the issue of a prenuptial agreement originated with the defendant in the summer prior to the marriage but that the plaintiff at first did not think one was necessary. The plaintiff testified, however, that in the weeks leading to the wedding, her estate planning attorney urged her to reconsider the matter out of a concern for her daughter, who was then seven years old.

An initial draft of the agreement was generated by the plaintiff's attorney approximately one week before the wedding and, upon receiving a copy, the defendant retained his own attorney. Neither party was satisfied with the first draft and, in the days leading to their wedding, the parties and their respective attorneys intensely negotiated the terms of seven subsequent drafts before executing the final draft just hours before the wedding ceremony, which took place on October 7, 1988, in Madison.

The agreement provided, inter alia, that both parties would waive any right to the other's earned or unearned income, as well as alimony and property in the event

of a dissolution. Appended to the agreement were financial statements completed by each party. The plaintiff's statement listed assets totaling $1,223,000, consisting of cash accounts, real property, personal property and an individual retirement account. The defendant's statement disclosed assets totaling $576,000, comprised of cash, marketable securities, real property, personal property, retirement accounts and an interest in an estimated $150,000 inheritance from his mother's estate. Neither statement listed the parties' respective incomes, although both were receiving income. The plaintiff, who possesses a bachelor's degree in journalism, a master's degree in corporate communications and a juris doctor degree, was not employed at the time but received social security and rental income from commercial property she owned in Madison and a vacation home in St. John in the United States Virgin Islands.

During the parties' marriage, the defendant enjoyed a successful corporate career. At the time the parties began their relationship in 1985, the defendant was employed in a management position at Chloride Lighting (Chloride), a company located in North Haven. He remained at Chloride until March, 1990, when he accepted a position as president of Magna Tech. After only nine months at Magna Tech, the defendant commenced a position as general manager of Black & Decker, where he remained employed until November, 1997. Upon his retirement from Black & Decker, the defendant started his own consulting business, where he continued to work until the time of dissolution.

After fifteen years of marriage, the plaintiff, in November, 2002, brought a dissolution action, claiming that the marriage had broken down irretrievably. She requested an equitable distribution of the parties' assets and an award of periodic alimony. In December, 2002, the defendant filed a cross complaint requesting, inter alia, enforcement of the prenuptial agreement.

The matter was tried before the court over four days in September and November, 2003. During trial, the plaintiff argued that the prenuptial agreement was unenforceable and requested that the court fashion its financial orders in accordance with General Statutes §§ 46b-81 and 46b-82. The plaintiff argued in particular that the agreement was unenforceable because it did not satisfy the requirements set forth in *McHugh* v. *McHugh*, 181 Conn. 482, 485–86, 436 A.2d 8 (1980).[1] In *McHugh*, our Supreme Court set forth a three-pronged test by which courts determine the validity of a prenuptial agreement: "The validity of an antenuptial contract depends upon the circumstances of the particular case. . . . Antenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice." (Citation omitted.) Id.

The plaintiff argued that (1) the agreement was not validly entered into because she was not made fully aware of the defendant's income and assets prior to executing the agreement and (2) enforcement of the agreement would be unconscionable because the defendant's financial situation at the time of dissolution was beyond the contemplation of the parties when the agreement was executed. The plaintiff raised, after the close of evidence in a posttrial brief, the additional

[1] Prenuptial agreements entered into after October 1, 1995, are governed by the Connecticut Premarital Agreement Act, General Statutes § 46b-36a et seq. The agreement at issue was executed on October 7, 1988, and, therefore, its validity is determined by common law.

argument that the agreement was invalid because the defendant failed to comply with one of its terms, thereby entitling her to rescind the agreement.

On February 26, 2004, the court issued a memorandum of decision regarding the enforceability of the prenuptial agreement. Finding that the three prongs of *McHugh* had been satisfied, the court concluded that the agreement was enforceable. With regard to the plaintiff's claim that the contract had been rescinded, the court explained in an articulation of its decision that the plaintiff had not demonstrated that the defendant had violated the terms of the agreement. From these determinations the plaintiff has appealed.

I

We first address the plaintiff's claim that the court improperly enforced the prenuptial agreement and fashioned its financial orders in accordance with its terms. We address in turn each of the plaintiff's three supporting arguments.

A

We begin by addressing the plaintiff's argument that the agreement was not validly entered into because neither party disclosed his or her income prior to executing the agreement. We disagree.

As the plaintiff asserts that the facts found were insufficient to support the court's legal conclusion, this issue presents a mixed question of law and fact to which we apply plenary review. *Duperry* v. *Solnit*, 261 Conn. 309, 318, 803 A.2d 287 (2002). We must therefore decide whether the court's conclusions are legally and logically correct and find support in the facts that appear in the record. See *Tuchman* v. *State*, 89 Conn. App. 745, 750, 878 A.2d 384 (2005).

This claim implicates the first prong of *McHugh*, which our Supreme Court explained as follows: "To determine whether an antenuptial agreement relating to property was valid when made, courts will inquire whether any waiver of statutory or common-law rights, or the right to a judicial determination in any matter, was voluntary and knowing." *McHugh* v. *McHugh*, supra, 181 Conn. 486. The court further explained: "A party must, of course, be aware of any right that he possesses prior to a proper waiver of it. . . . The duty of each party to disclose the amount, character, and value of individually owned property, absent the other's independent knowledge of the same, is an essential prerequisite to a valid antenuptial agreement containing a waiver of property rights. . . . The burden is not on either party to inquire, but on each to inform, for it is only by requiring full disclosure of the amount, character, and value of the parties' respective assets that courts can ensure intelligent waiver of the statutory rights involved." (Citations omitted.) Id., 486–87.

In the present case, the court found, and the record supports, that the plaintiff was sufficiently aware of the defendant's financial circumstances at the time the agreement was executed so as to intelligently waive her right to any income, real or personal property and any claim to alimony. The court explained: "Testimony revealed . . . that the parties dated for several years before they were married. Neither party disputes that during their courtship, the parties shared expenses and became knowledgeable of the other's standard of living and spending habits. As noted in *McHugh*, failure to disclose financial information in the prenuptial agreement is not fatal so long as the other party has independent knowledge of the same." The court observed in its decision that although neither party had expressly disclosed their respective incomes on the financial statements annexed to the agreement, the

agreement was nevertheless valid because the parties had "independent knowledge,"[2] mistakenly referred to by the court as "index pendent knowledge," of each other's assets when the agreement was executed.

This finding was supported by testimony at trial. The plaintiff stated that during their three year courtship, the parties spent considerable time together, shared expenses and vacationed together. She testified that she became knowledgeable of the defendant's lifestyle and spending habits. The defendant similarly testified that during their courtship, the plaintiff became aware of his spending patterns.

In reaching its determination, the court also was mindful of several other relevant factors. The *McHugh* court stated that "[o]ther factors that bear upon the validity of such contracts include which party drafted the agreement, by counsel or otherwise, and whether the parties were represented by counsel." *McHugh* v. *McHugh*, supra, 181 Conn. 487. In its memorandum of decision, the court noted, and the record supports, that

[2] In its memorandum of decision, the court concluded that the parties had "index pendent knowledge" of each other's income and assets and cited to *McHugh* as the source of that term. The court's use of this term appears to be based on a typographical error in the electronic version of *McHugh*, which did, until corrected in July, 2005, refer to "index pendent knowledge." The version of *McHugh* bound in the Connecticut Reports correctly refers, however, to "independent knowledge."

Regrettably, "index pendent knowledge" has been referenced and discussed in numerous Superior Court opinions. See, e.g., *Gibson* v. *Gibson*, Superior Court, judicial district of New Haven, Docket No. FA-01-0458344-S (August 6, 2004) (*Gilardi, J.*) (37 Conn. L. Rptr. 693); *Wilmot* v. *Wilmot*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FA-95-0147844-S (November 27, 1998) (*Tierney, J.*); *Baumgartner* v. *Baumgartner*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FA-96-0155390-S (November 10, 1998) (*Tierney, J.*). Although the reasoning underlying the concept of "independent knowledge" is not compromised by the misnomer, the importance of accurately identifying legal concepts is critical to the development of a cohesive and coherent body of law. We therefore refer throughout this opinion to "independent knowledge" despite both the trial court's and the parties' use of the term "index pendent knowledge."

the plaintiff, herself an attorney who practiced law during the marriage, was represented by counsel, that it was her attorney who originally drafted the agreement, and that at least seven drafts of the agreement were discussed and negotiated by the parties before agreement was reached on the final draft.

On the basis of the foregoing, we conclude that there was a sufficient factual basis for the court's finding that the parties possessed "independent knowledge" of each other's financial situation and that each was sufficiently aware of his or her rights and obligations to waive them. We further conclude that the court's determination, on that basis, that the agreement was validly entered into was legally and logically correct and supported by the facts in the record.[3]

B

We turn now to the plaintiff's argument that the defendant's financial circumstances at the time of dissolution were so far beyond the contemplation of the parties when they executed the agreement as to make enforcement of the agreement unconscionable. We disagree.

As this claim also implicates both questions of law and fact, our review is plenary. *Duperry* v. *Solnit*, supra, 261 Conn. 318.

According to the third prong of *McHugh*, a prenuptial agreement will not be enforced "where the circumstances of the parties at the time of the dissolution are *so far beyond the contemplation of the parties* at the time the agreement was made *as to make enforcement of the agreement work an injustice.* . . . [W]here the

---

[3] The plaintiff devotes a portion of her brief to the claim that the court's determination rested on its conclusion that the plaintiff did not "complain" about the lack of disclosure of income. Upon our review of the memorandum of decision, we do not agree that this formed a basis upon which the court determined that the first prong of *McHugh* was satisfied.

economic status of parties has *changed dramatically* between the date of the agreement and the dissolution, literal enforcement of the agreement may work injustice. Absent such *unusual circumstances*, however, [prenuptial] agreements freely and fairly entered into will be honored and enforced by the courts as written." (Citations omitted; emphasis added.) *McHugh* v. *McHugh,* supra, 181 Conn. 489.

The plaintiff contends that the defendant's estate increased by approximately 430 percent over the course of the marriage and that the parties could not have contemplated such an increase. In rejecting this argument, the court acknowledged that the defendant's estate had increased significantly during the marriage but that this increase was not beyond the parties' contemplation. The court stated: "It could not be unanticipated that the defendant would continue working, which would increase his retirement benefits, nor that he would continue his investments which would increase his portfolio, the combination of [which] primarily represents the defendant's present financial assets."

Our review of the record reveals that the court's determination was not improper. The plaintiff failed to demonstrate to the court any facts establishing the type of extraordinary change in economic status contemplated by *McHugh*. What is easily gleaned from the language employed by our Supreme Court in *McHugh* is that the threshold for finding such a dramatic change is high. The court made clear that the change must be "so far beyond the contemplation of the parties . . . as to make enforcement of the agreement work an injustice." *McHugh* v. *McHugh,* supra, 181 Conn. 489. The court further stressed that economic status must have "changed dramatically" and that a finding that such change has occurred would be an "unusual [circumstance]." Id.

We agree with the trial court that it must have been contemplated by the parties that the defendant would continue working in the corporate arena and that, over the course of years, his income would increase as well as his retirement benefits and investments.[4] These circumstances do not constitute the type of dramatic or unusual circumstances contemplated by *McHugh*.

We accordingly conclude that the record supports the court's finding that the defendant's current financial situation was not beyond what the parties had contemplated when they executed the agreement.

C

We turn finally to the plaintiff's argument that the agreement is unenforceable because the defendant violated a term of the agreement, permitting her to rescind the agreement in its entirety. We disagree.

Paragraph seven of the prenuptial agreement provides: "At such time as [the defendant] retires, [the plaintiff] will consent to any plan of distribution or other distribution of his pension benefits which he elects and

---

[4] The plaintiff argues additionally that the court should have considered the value of the defendant's Black & Decker pension when determining whether his estate had increased beyond the contemplation of the parties. The court determined that because the pension in pay status plan "could not be liquidated, alienated, or traded in" it was, therefore, properly considered as income, rather than an asset. The plaintiff contends that this pension should have been considered a marital asset.

Although there is no appellate case law that requires a pension in pay status be considered an asset, our Supreme Court has strongly suggested that result in *Krafick* v. *Krafick*, 234 Conn. 783, 663 A.2d 365 (1995). Even if we assume arguendo that the court should have considered the pension as an asset when calculating the value of the defendant's estate, our conclusion that the third prong of *McHugh* was satisfied is not affected. The only evidence as to the value of the defendant's pension was his "guess" that it had an approximate value of $200,000. If we assume that this testimony were sufficient for the court to have assigned the pension this value, the defendant's estate still would not have increased to the dramatic degree contemplated in the third prong of *McHugh*.

will sign any document required to effect such election; provided, however that at such time as any distribution [to the defendant] exceeds 60% of the value of his pension plan assets, determined as of the date of such distribution, [the defendant] agrees that [the plaintiff], at her option, is entitled to up to 25% of the proceeds from such distribution."

The plaintiff claimed at trial that in 1991, the defendant rolled over his entire Chloride pension account, in the amount of $157,132, into a separate self directed retirement account. The plaintiff argues that this rollover constituted a "distribution," as that term is used in the agreement, and that the defendant failed to provide her with a 25 percent portion of the amount purportedly distributed. She claims, therefore, that the defendant violated paragraph seven and that she is now entitled to rescind the agreement.[5]

"Rescission, simply stated, is the unmaking of a contract. It is a renouncement of the contract and any property obtained pursuant to the contract, and places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract." (Internal quotation marks omitted.) *Kim* v. *Magnotta*, 49 Conn. App. 203, 223, 714 A.2d 38 (1998) (*Lavery, J.*, dissenting), rev'd on other grounds, 249 Conn. 94, 733 A.2d 809 (1999). "[T]he effect of a rescission is to extinguish the contract and to annihilate it so effectively that in contemplation of law it has never had any exis-

---

[5] The record is incomplete as to whether this distribution was made by a trustee to trustee transfer, whether the plaintiff consented to the transfer and when, if ever, she elected to receive 25 percent of the amount of the distribution. The record also does not contain any evidence as to whether the defendant, in fact, "retired" in 1991 as contemplated by the agreement. Despite repeatedly claiming in her brief that the defendant retired in 1991 when he left the employ of Chloride to pursue employment opportunities elsewhere, she twice stated at trial that the defendant retired in 1997 when he left Black & Decker to start his own consulting business. She stated also that she attended his retirement party in 1997.

tence, even for the purpose of being broken. Accordingly, it has been said that a lawful rescission of an agreement puts an end to it for all purposes, not only to preclude the recovery of the contract price, but also to prevent the recovery of damages for breach of the contract. An election to rescind a contract waives the right to sue upon it. After rescission for a breach, there is no right to sue on the contract for damages for such breach." 17 Am. Jur. 2d 1002–1003, Contracts § 516 (1964).

In her brief, the plaintiff refers in a footnote to three cases that discuss, in very general terms, the remedy of rescission in contract cases. The plaintiff has neither demonstrated nor alleged that she elected to rescind the agreement at any time while this matter was pending. We also do not have before us sufficient evidence to determine if such a material breach has occurred as would entitle that plaintiff to rescission. See footnote 5. The plaintiff had ample opportunity to initiate an action to rescind the contact but failed to do so. She cannot now seek appellate review of this claim when she has not taken actions consistent with an intention to pursue this remedy in the trial court.

## II

The plaintiff claims finally that the court committed numerous factual errors so egregious as to prejudice her and warrant reversal of the judgment and a new trial. We disagree.

The plaintiff states in her brief: "In addition to the errors of legal interpretation already discussed . . . the trial court's memorandum of decision and subsequent two articulations contain numerous factual inaccuracies and offer statements not in evidence. The pervasiveness and magnitude of the inaccuracies are so serious as to cast doubt on the court's full understanding of the intricacies of this complex dissolution

action. The plaintiff respectfully posits that she was fatally prejudiced by these errors and that the judgment should be reversed and the case remanded for a new trial."

Our review of factual determinations requires that we do not attempt to retry a trial court's factual findings. Unless those findings are clearly erroneous, we do not disturb them. *Lucas* v. *Lucas*, 88 Conn. App. 246, 251, 869 A.2d 239 (2005).

Although the trial court may have confused or mischaracterized certain facts, including some related to the nature of some of the defendant's retirement plans, the plaintiff has failed to provide any analysis that would demonstrate how these purported factual inaccuracies, either individually or in the aggregate, tainted any of the court's ultimate determinations or impacted the fundamental fairness of the trial. Under similar circumstances involving minor quibbles over nomenclature and technically inaccurate findings, we have declined to order a new trial. See, e.g., *Record Journal Publishing Co.* v. *Meriden*, 51 Conn. App. 508, 511–12, 722 A.2d 291 (1999) (concluding that court's factual finding, although technically incorrect, was not pertinent to resolution of ultimate issues before court); see also *Grosso* v. *Grosso*, 59 Conn. App. 628, 636, 758 A.2d 367 (finding defendant failed to present evidence that court's typographical error regarding amount, interval of alimony payment prejudiced him or affected court's ultimate conclusions), cert. denied, 254 Conn. 928, 761 A.2d 761 (2000).

The judgment is affirmed.

In this opinion the other judges concurred.