# FIRST NATIONAL BANK OF LITCHFIELD *v.* BRUCE V. MILLER ET AL.
## (AC 26278)

Flynn, Bishop and Hennessy, Js.[1]

[1] The listing of judges reflects their status on this court as of the date of argument.

Argued December 1, 2005—officially released September 12, 2006

*Bruce V. Miller*, pro se, and *Linda M. Miller*, pro se, the appellants, with whom, on the brief, were *Brendan J. O'Rourke, Jeffrey M. McCormick* and *Marianne F. Murray*, for the appellants (named defendant et al.).

*Bruce A. Foodman*, for the appellee (defendant Norwest Marine, Inc.).

*William C. Franklin*, for the appellee (plaintiff).

FLYNN, J. In this contract action involving the sale of a boat, the defendants Bruce V. Miller and Linda M. Miller decided to purchase a boat from the seller, the defendant Norwest Marine, Inc. (Norwest), and the plaintiff, First National Bank of Litchfield, was to finance this transaction. The Millers claim on appeal that the trial court improperly (1) concluded that they had accepted the boat from Norwest, (2) refused to allow the Millers' cross claims and counterclaims for breach of contract, fraud and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., (3) failed to consider mitigation of damages and (4) improperly refused to find that the plaintiff had violated General Statutes § 42-100c.[2] We agree with the Millers' first claim, that acceptance legally did not occur. Second, we agree that the court improperly rejected the Millers' cross claims and counterclaims on the basis of its improper finding of acceptance. Third, we decline to review the Millers' claim regarding mitigation of damages because of the lack of a sufficient record. Fourth, we agree that § 42-100c regarding errors in statements of a retail credit account does apply. Accordingly, we reverse the judgment of the trial court and remand the case for further proceedings not inconsistent with this opinion.

The record reflects the following facts and procedural history that are relevant to our resolution of this appeal. In the spring of 2000, the Millers decided to purchase a new Donzi motorboat. They visited Norwest and looked at the Z20 model, which was out of the water in the boatyard at the time. On April 30, 2000, the Millers signed the marine purchase agreement that provided,

---

[2] The Millers also claim that the court improperly refused to find the plaintiff in violation of General Statutes § 36a-770 et seq. In light of our reversal and remand, we do not reach the issue of attorney's fees.

inter alia, that the Millers had inspected the boat and were satisfied with it, and that title and ownership of the boat would pass from Norwest to the Millers at the time the purchase price was paid in full. The Millers also gave Norwest a down payment of $3500, approximately 10 percent of the anticipated purchase price.

Subsequent to entering into the marine purchase agreement, on May 12, 2000, the Millers signed the retail installment contract, as did Norwest. This contract provided, among other things, that it would be assigned by Norwest to the plaintiff after it was fully executed. In a section entitled "seller's agreement with lender," the contract contained a representation by Norwest that the boat had been delivered to the Millers and that they had accepted the boat. We consider it important to emphasize that this representation of delivery and acceptance was made by Norwest and not the Millers. The undisputed testimony of Bruce Miller reveals that when he signed the retail installment contract, the seller's agreement with the lender had not yet been signed by Norwest. The plaintiff sent a check dated May 16, 2000, payable to Norwest for $32,773, after the retail installment contract was returned to the plaintiff and found to be in order. Over the next two weeks, Norwest, at the Millers' request, installed a depth finder and radio on the boat and primed and painted its bottom.

Norwest and the Millers initially agreed that the Millers would take delivery and possession of the boat on May 20, 2000. Linda Miller testified that on May 18, 2000, an employee of Norwest telephoned the Millers to inform them that there were engine problems with the boat. This is supported by a statement made by the manager of Norwest in answer to an interrogatory, which was discussed during the cross-examination of Austin Iodice, the president of Norwest, stating that delivery could not occur on May 20, 2000, because of

a fuel obstruction. The Millers then agreed to take delivery and possession on May 27, 2000, the Saturday of Memorial Day weekend. On that day, however, an employee of Norwest took the Millers for a test ride on the boat, and the boat still did not perform satisfactorily. The undisputed testimony of Bruce Miller revealed that after the Millers had spent approximately five hours at the marina, and after unsuccessful attempts were made to repair the boat and after a second test ride, during which the boat again failed to perform satisfactorily, Bruce Miller requested that Norwest inform the Millers by the end of the weekend what it proposed to do with the boat. Linda Miller's testimony was undisputed that a Norwest yardman advised the Millers not to take the boat because it was "a lemon."

On Tuesday, May 30, 2000, the mechanics returned to work following the holiday weekend. Mark Suda, service manager at Norwest, testified that on that same day, he telephoned the Millers and requested that they return his telephone call and that he again telephoned the Millers on May 31, 2000, leaving them another message. Suda, however, testified on cross-examination, that although he called the Millers, he was not certain if he actually had left a message. Bruce Miller testified that he and his wife never received these messages, but that they did receive a telephone call from David Swindells, a salesperson for Norwest, on Thursday, June 1, 2000, and that Linda Miller informed him that they had sent a letter the previous day by Federal Express canceling the purchase. He further testified that Linda Miller expressed surprise that he had not received the letter. On June 6, 2000, the Millers wrote to the plaintiff, returning the coupon payment book, and indicating that they had rejected the boat and would not be making any payments.

On April 26, 2001, the plaintiff filed an amended complaint against the Millers and Norwest. The Millers subsequently filed a counterclaim against the plaintiff and

cross claim against the codefendant, Norwest. By agreement of the parties, Norwest sold the boat on or about October 31, 2001, to a bona fide purchaser for $19,500, and the proceeds from this sale are held in an escrow account pending the outcome of this action.

After a trial to the court, the court held that ownership of the boat was transferred to the Millers on or about May 16, 2000, when the plaintiff sent its check to Norwest in payment of the purchase price and that the attempt by the Millers to revoke their acceptance was wrongful because Norwest had seasonably cured any defect. The court held that, under the retail installment contract, the debt owed by the Millers, who were in default because they had not made the required monthly payments to the plaintiff, was $48,157.78. The agreement also had provided for reasonable attorney's fees in the case of default, and the court awarded the plaintiff $7223.55 in attorney's fees. The court found in favor of Norwest on its counterclaim against the Millers for $1222 for the depth finder, radio and painting, which were ordered by the Millers and installed in the boat. This appeal followed.

I

The Millers first claim that the court improperly found that they had accepted the boat.[3] We agree.

First, we must determine the applicable standard of review. The Millers aver that a plenary standard should be employed because a question of statutory interpretation is involved. The plaintiff, however, argues that the Millers essentially challenge findings of fact, namely, whether they accepted the boat and properly revoked acceptance, and, therefore, the clearly erroneous standard is applicable. "Generally, the question of whether

---

[3] The Millers claim that the court stated that acceptance occurred on May 12, 2000. However, we are unable to find any explicit statement by the court as to the exact date it found the Millers to have accepted the boat.

or not the buyer has accepted goods is a question of fact for the jury, or judge in a nonjury trial, and, where there is a conflict in the evidence with respect to the issue, the parties are entitled to a finding thereon. However, when the evidence with respect to acceptance of goods admits of only one reasonable conclusion, the issue becomes one of law." 67 Am. Jur. 2d 697, Sales § 578 (2003). Additionally, "[w]hether the court properly applied the relevant provisions of [General Statutes] § 42a-1-101 et seq. involves statutory interpretation, which is a question of law." (Internal quotation marks omitted.) *Kalas* v. *Cook*, 70 Conn. App. 477, 482, 800 A.2d 553 (2002). We conclude that the applicable standard in the present case is plenary.

On April 30, 2000, when the Millers executed the marine purchase agreement, the boat was out of the water in the boatyard. That agreement specifically provided that the Millers had inspected the boat and were satisfied with it. However, it was not until almost one month later, on May 27, 2000, that an employee of Norwest took the Millers for a test ride in the boat, which was not operating properly. The boat was not repaired until after the Memorial Day weekend, on Wednesday, May 31, 2000.

General Statutes § 42a-2-606 (1) provides: "Acceptance of goods occurs when the buyer (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or (b) fails to make an effective rejection as provided by subsection (1) of section 42a-2-602,[4] but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership; but if such act is

---

[4] General Statutes § 42a-2-602 (1) provides: "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."

wrongful as against the seller it is an acceptance only if ratified by him."

Professors White and Summers provide an illustration that is very similar to the present case where acceptance could not occur until there was a reasonable opportunity to inspect the goods: "Suppose a purchaser signs a contract which contains a clause to the effect that she has inspected the automobile or other merchandise and found it to be conforming. A few cases to the contrary notwithstanding, the prevailing view is that one who buys complex goods such as an automobile and signs a contract for purchase after only a short demonstration ride should not be held to have had a 'reasonable opportunity to inspect' and therefore not be held to have accepted the goods." J. White & R. Summers, Uniform Commercial Code (5th Ed. 2000) § 8-2, p. 308. Here, the demonstration ride occurred *after* the Millers signed the contract that stated that they had inspected the boat and were satisfied with it. "[A] buyer must be afforded a reasonable opportunity to inspect goods to determine whether they should be rejected . . . ." (Citation omitted.) *Bead Chain Mfg. Co* v. *Saxton Products, Inc.*, 183 Conn. 266, 271, 439 A.2d 314 (1981); General Statutes § 42a-2-513 (1).[5] Under the facts of this case, we conclude that the evidence admits of one conclusion and that is that the Millers

---

[5] "The buyer may waive the right to inspect the goods either expressly or by agreeing to payment terms which are inconsistent with a right to inspect." 4 R. Anderson, Uniform Commercial Code (3d Ed. Rev. 1997) § 2-513:12; General Statutes § 42a-2-513. There is no evidence that such is the case here. Furthermore, the official comments to the Uniform Commercial Code suggest that because the Millers did not receive the boat or begin payment, they still had the right to inspect. Official Comment 2 to § 2-513 of the Uniform Commercial Code suggests: "[t]he buyer's right of inspection is available to him upon tender, delivery or appropriation of the goods with notice to him. . . . It is also available to him after receipt of the goods and so may be postponed after receipt for a reasonable time. Failure to inspect before payment does not impair the right to inspect after receipt of the goods unless the case falls within [§ 42a-2-513 (4)]."

were not given a reasonable opportunity to inspect the boat and, therefore, acceptance could not have occurred at the time of the signing of the retail installment contract under § 42a-2-606 (1) (a).

For the same reasoning, we further conclude that acceptance could not have occurred under § 42a-2-606 (1) (b) because acceptance under that provision cannot occur "until the buyer has had a reasonable opportunity to inspect [the goods] . . . ." General Statutes § 42a-2-606 (1) (b). Additionally, there is no evidence that, pursuant to § 42a-2-606 (1) (c), the buyer did any act inconsistent with Norwest's ownership. American Jurisprudence states that "[t]he following acts by the buyer have been held to constitute conduct inconsistent with a seller's ownership and, thus, to result in acceptance of the goods by the buyer: (1) continued use of [a] vehicle after attempted rejection; (2) offering of goods for sale; (3) signing all necessary papers and taking delivery of a vehicle; (4) repairing, correcting, and altering the purchased product;[6] and (5) attempting repairs

---

[6] The court found that over the course of the two weeks following the May 12, 2000 "closing," at the Millers' request, Norwest installed a depth finder and a radio on the boat and primed and bottom painted the boat. Thereafter, on May 27, 2000, the Millers, for the first time, were taken for a demonstration ride in the boat and at that time noticed that the boat did not perform satisfactorily. Treatises suggest that acts done by the buyer without knowledge of the defect do not constitute acceptance. For instance, White and Summers state: "We think it vital to an intelligent interpretation of section 2-606 (1) (c) that one consider the buyer's act in the context of the buyer's knowledge and behavior prior to that act. An act may have a different meaning when done by a buyer in ignorance of a defect than it would have if the buyer knew of the defect. . . . To give meaning to [§] 2-606 (1) (c), buyers' acts ought to be divided into at least three categories: (1) acts done in ignorance of the defect; (2) acts done with knowledge that the goods are defective, but before any attempt is made to reject; and (3) acts done with knowledge that the goods are defective and after an attempt to reject. We would argue that acts done in ignorance of the defects which buyer could not have discovered are never covered by [§] 2-606 (1) (c)." J. White & R. Summers, supra, § 8-2, pp. 309–10; see also 4 R. Anderson, Uniform Commercial Code (3d Ed. Rev. 1997) § 2-606:36 ("[a]cts done by the buyer in ignorance of the existence of latent defects do not constitute an acceptance of the goods").

on the equipment by the buyer to put it in proper condition, coupled with the use of part of the equipment for the buyer's own purposes." 67 Am. Jur. 2d 695–96, supra, § 576. The Millers took no such actions. They did not take delivery of the boat, nor did they themselves take action to alter or repair the boat.[7]

Because the Millers never accepted the boat, it is axiomatic that they could not have revoked their acceptance wrongfully or even rightfully. Therefore, we reject the court's finding that the Millers had accepted the boat[8] and remand the case for further proceedings.

## II

The Millers next claim that the court improperly refused to allow their claims for breach of contract, fraud and violation of CUTPA. We agree that these claims should have been considered and remand the case for a hearing on the merits of these claims.

The retail installment contract contained a separate agreement entitled "seller's agreement with lender," between Norwest and the plaintiff, which provided that the boat "has been delivered to the Buyer or Co-buyer and said property has been accepted." In their amended answer, the Millers cross claimed against Norwest for fraud and for violation of CUTPA, and counterclaimed against the plaintiff for breach of contract, fraud and violation of CUTPA. The court rejected these claims, reasoning that the Millers' revocation of acceptance of title to the boat was wrongful and, on that basis, refused to allow these claims. Because we have concluded that the Millers never accepted the boat, we remand these claims for the court's consideration.

---

[7] The fact that the Millers signed an application for a temporary registration certificate of the boat does not indicate that they had accepted the boat.

[8] While we find that there was no acceptance, we make no determination regarding whether there was a proper rejection or whether such a finding is necessary.

### III

The Millers next claim that the damages award was improper because the court failed to consider mitigation of damages. Specifically, they claim that Norwest had an obligation to mitigate its damages by reselling the boat sooner than it did and that Norwest's failure to mitigate damages applies equally to the plaintiff. We decline to review this claim.

Our careful review of the record reveals that the Millers did not raise the defense of mitigation against the plaintiff in their pleadings before the trial court or in their trial briefs. "Absent plain error, issues raised for the first time on appeal will not be reviewed." *Lopiano* v. *Stamford*, 22 Conn. App. 591, 594, 577 A.2d 1135 (1990). Furthermore, if the court in its memorandum of decision failed to address any claim the Millers had raised, they could have filed a motion for articulation, which was not done. See Practice Book § 66-5. In short, the Millers did not preserve this claim for appeal and have failed to provide us with an adequate record. Accordingly, we decline to review this claim.

### IV

The Millers next claim that the court improperly refused to find that the plaintiff had violated § 42-100c. The Millers contend that the statute required the plaintiff to investigate the controversy between them and Norwest and that no such investigation was conducted. We agree that the statute applies in the present case and that it required the plaintiff to investigate.

Because the resolution of this claim involves a question of whether the facts found were insufficient to support the court's legal conclusion, this issue presents a mixed question of law and fact to which we apply plenary review. See *Duperry* v. *Solnit*, 261 Conn. 309,

318, 803 A.2d 287 (2002). We therefore must decide whether the court's conclusions are legally and logically correct and find support in the facts that appear in the record. See *Winchester* v. *McCue*, 91 Conn. App. 721, 726, 882 A.2d 143, cert. denied, 276 Conn. 922, 888 A.2d 91 (2005).

Section 42-100c provides in relevant part: "(a) If a debtor, upon receipt of a statement of his account under a retail credit transaction, believes that there is an error in such statement *as to the whole* or any part of the amount shown as owing to the creditor, he may, in writing . . . so notify the creditor, stating the basis or reasons for his belief that the statement is in error. The creditor shall . . . investigate the debtor's complaint and make the necessary corrections in such account and submit a corrected statement or send a written explanation to the debtor setting forth the reasons why the creditor believes the account is correct as shown in the statement. . . ." (Emphasis added.)

The court rejected the Millers' claim under this statute, reasoning that the Millers, in their June 6, 2000 letter to the plaintiff, did not claim that there was an error in the statement of account that they were seeking to have corrected, but rather they were notifying the plaintiff that they were canceling the transaction itself and refusing to make any payments at all. Although the Millers did not use the word "error" in their June 6, 2000 letter to the plaintiff, they indicated it was their belief that there was a dispute as to the whole amount shown as owing to the creditor.[9] Our reading of the plain language of § 42-100c, leads us to the conclusion that the statute applies to the facts presented because

[9] In a letter offered into evidence and dated June 6, 2000, the Millers reasoned that because they "never took delivery of the boat due to Norwest's repeated failures to deliver a boat in good working order," they "expect [the plaintiff] to cancel this account" and were "putting [the plaintiff] on notice that [the] matter [was] in dispute."

it requires a creditor to investigate a debtor's complaint if a debtor believes that there is an error in such statement as to the whole amount.[10] We therefore remand the case for a determination of whether the plaintiff complied with its statutory obligations.

In summary, we reject the court's determination that the Millers accepted the boat, and we remand the case for further proceedings. We conclude that the court improperly rejected the Millers' cross claims and counterclaims on the basis of its improper finding of acceptance, and that § 42-100c regarding errors in statements of a retail credit account does apply.

The judgment is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

In this opinion HENNESSY, J., concurred.

BISHOP, J., dissenting. In this contract matter, the trial court determined that the defendants Bruce V. Miller and Linda M. Miller accepted the boat in question and that their acceptance had not been revoked by their later refusal to take possession of the boat. Because the question of acceptance is fact bound and because I believe that the court's determination in this regard was not clearly erroneous, I respectfully dissent.

---

[10] As a preliminary matter, this is a retail credit transaction. Section 42-100b defines "retail credit transaction," as used in General Statutes § 42-100c, as "any agreement or transaction for the retail sale of goods or services which are used or bought primarily for personal, family or household purposes, but does not include transactions covered by chapter 4 of the Consumer Credit Protection Act, 15 USC 1666 et seq., as from time to time amended." The agreement at issue in this claim is entitled "Retail Installment Contract and Security Agreement," and involved the sale of a boat to the Millers. The federal statute does not cover credit transactions in which the financed amount exceeds $25,000. 15 U.S.C. § 1603 (3). Because the Millers borrowed more than $25,000, the federal statute does not apply in this case.

On appeal, the Millers challenge the court's finding that they accepted the boat. While I agree with the majority's recitation of the facts leading to the parties' dispute, I depart from the majority's analysis of the facts and, in particular, its failure to give appropriate deference to the court's factual findings.

To be sure, the question of whether the Millers accepted the boat is a factual finding for the trial court's determination. See *Contoura Business Products, Inc.* v. *TLD, Inc.*, 1 Conn. App. 690, 692, 474 A.2d 1265 (1984). "[W]e will upset a factual determination of the trial court only if it is clearly erroneous. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . .  or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Forastiere* v. *Higbie*, 95 Conn. App. 652, 655–56, 897 A.2d 722 (2006). "In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 544, 893 A.2d 389 (2006). Rather than employing the deferential standard of review applicable to a trial court's factual findings, the majority claims an entitlement to plenary review and concludes that the record contains no facts consistent with the court's findings. I believe, to the contrary, that the record provides ample support for the court's finding of acceptance.

General Statutes § 42a-2-606 (1) provides: "Acceptance of goods occurs when the buyer (a) after a reasonable opportunity to inspect the goods signifies to the

seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or (b) fails to make an effective rejection as provided by subsection (1) of section 42a-2-602, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him."

In this case, the Millers signed a purchase agreement on May 12, 2000. Subsequently, the Millers requested that the seller, the defendant Norwest Marine, Inc. (Norwest), install a depth finder and a radio on the boat. Additionally, they had the bottom of the boat primed and painted. Finally, the Millers filed an application for a registration with the department of motor vehicles on which they listed themselves as the owners of the boat. All of these actions were inconsistent with Norwest's ownership of the boat and consistent with the court's finding that the Millers had accepted the boat.[1] Indeed, these actions were consistent with the Millers' ownership of the boat.[2] Therefore, in accordance with § 42a-2-602 (c) and the highly deferential standard we are required to employ, I would find that

[1] Acts that courts have found inconsistent with the seller's ownership include "making payments, taking possession of the goods, use of the goods, repairing, working on them, attempts to resell them, and dealing with them in other ways." 1 J. White & R. Summers, Uniform Commercial Code (4th Ed. 1995) § 8-2, p. 437.

[2] Although, arguably, the acts of a buyer in justifiable ignorance of the defective nature of the goods should not be held inconsistent with the seller's ownership, in this instance, because the Millers could have undertaken a sea trial to discover any latent defects prior to customizing the boat and having it registered in their names, I would not find the Millers' ignorance of the claimed defect in this case justifiable. Additionally, I believe that the record supports the court's conclusion that the Millers did not properly revoke their acceptance because the claimed defect was not a major problem and did not substantially impair the value of the boat because the defect was seasonably cured by Norwest.

the court's conclusion that the Millers accepted the boat was not clearly erroneous.

Because acceptance of goods precludes rejection,[3] and the Millers have not challenged the court's finding that they failed to revoke their acceptance of the boat, I would affirm the judgment of the court.[4]

The majority also concludes that the court improperly determined that the plaintiff, First National Bank of Litchfield, had not violated General Statutes § 42-100c.[5] This statute, entitled "Errors in the statement of a retail credit account," refers to notification by a debtor of an error in the statement of a retail credit account sent by a creditor to a debtor and requires a creditor to investigate whether there was such an error. The Millers did not claim that there was an error in the statement of their account, but rather they were notifying the plaintiff that there was a dispute between them and Norwest, and that they were canceling the transaction and refusing to make any payments at all. As noted by the trial court, the Millers' contention that § 42-100c

---

[3] General Statutes § 42a-2-607 (2) provides in relevant part: "Acceptance of goods by the buyer precludes rejection of the goods accepted . . . ."

[4] Because I agree with the trial court's determination that there was acceptance, I would also affirm the court's judgment in favor of the plaintiff and Norwest as to the Millers' counterclaim and cross claim.

[5] General Statutes § 42-100c (a) provides: "If a debtor, upon receipt of a statement of his account under a retail credit transaction, believes that there is an error in such statement as to the whole or any part of the amount shown as owing to the creditor, he may, in writing, not later than sixty days from the date of mailing of such statement, so notify the creditor, stating the basis or reasons for his belief that the statement is in error. The creditor shall within thirty days after receipt of such notification send a written acknowledgment to the debtor, and no later than two complete billing cycles of the creditor but in no event more than ninety days after receipt of the notification, investigate the debtor's complaint and make the necessary corrections in such account and submit a corrected statement or send a written explanation to the debtor setting forth the reasons why the creditor believes the account is correct as shown in the statement. Prior to completing such investigation, the creditor shall take no action to collect the amount in dispute or to in any way affect the debtor's credit rating."

required the plaintiff to investigate the underlying controversy between them and Norwest as to acceptance or revocation of acceptance, or both, does not find support in the statute or in any other legal authority. I further note that the statute is part of chapter 733a of the General Statutes, entitled "Retail Credit Transaction Statement Errors." I read this chapter as pertaining exclusively to the documentation of retail credit transactions and not to disputes underlying the transaction. Therefore, I would affirm the judgment of the court in this respect as well.

Accordingly, I respectfully dissent.[6]

---

[6] I agree with the majority's analysis of the remaining issues on appeal.