# FIRST NATIONAL BANK OF LITCHFIELD *v.*
# BRUCE V. MILLER ET AL.
### (SC 17750)
### (SC 17774)

Katz, Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued September 17, 2007—officially released January 29, 2008

*Richard F. Wareing,* with whom were *Joseph J. Chambers* and, on the brief, *Cynthia A. Erickson,* for the appellant in Docket No. SC 17750 (defendant Norwest Marine, Inc.).

*William C. Franklin,* for the appellant in Docket No. SC 17774 (plaintiff).

*Bruce V. Miller,* pro se, with whom, on the brief, was *Linda M. Miller,* pro se, the appellees (named defendant et al.).

SCHALLER, J. These consolidated appeals arise from the attempt of the plaintiff, First National Bank of Litchfield, to recover money it had loaned to the defendants Linda Miller and Bruce Miller (collectively, Millers) to finance their purchase of a boat from the defendant Norwest Marine, Inc. (Norwest). The plaintiff and Norwest appeal upon respective grants of certification,[1] from the judgment of the Appellate Court reversing the judgment of the trial court, which had concluded that the Millers were obligated to repay the loan from the plaintiff. The issues before us in these certified appeals are whether the Appellate Court properly concluded that: (1) the Millers did not accept the boat in question; and (2) General Statutes § 42-100c applied to the transaction. We reverse the judgment of the Appellate Court.

The trial court found the following relevant facts. Norwest is a retail boat distributor in Norwalk. In the spring of 2000, the Millers went to Norwest's boatyard and looked at a new Donzi Z20 motorboat, which was on stilts in the boatyard at the time. On April 30, 2000, the Millers paid Norwest a deposit of $3500 on the boat, approximately 10 percent of the purchase price. At that time, the Millers also executed a marine purchase agreement (purchase agreement) on a form furnished by Norwest. The purchase agreement provided, inter alia, that title and ownership of the boat would pass from Norwest to the Millers when the purchase price was paid in full. The purchase agreement also provided

---

[1] We granted Norwest's petition for certification, limited to the following question: "Did the Appellate Court properly conclude that the [Millers] did not accept the boat in question?" *First National Bank of Litchfield* v. *Miller*, 280 Conn. 931, 909 A.2d 957 (2006). We granted the plaintiff's petition for certification, limited to the following questions: "Did the Appellate Court properly conclude that: (1) the [Millers] had not accepted the boat; and (2) General Statutes § 42-100c applied to the transaction?" *First National Bank of Litchfield* v. *Miller*, 280 Conn. 940, 912 A.2d 475 (2006).

that transfer of ownership and delivery of the boat to the Millers would not necessarily occur at the same time. Such an arrangement, separating the time of title transfer and delivery, was not uncommon, as buyers often purchase boats in the winter months, but do not desire delivery until spring. The purchase agreement further provided that the Millers had inspected the boat and were satisfied with it.[2] Finally, the purchase agreement provided that it constituted the entire agreement between the parties and that "no other representations, inducements or promises (written or verbal) have been made which are not set forth in this agreement."

When the Millers informed Norwest that they had decided to obtain financing for the purchase of the boat, Norwest contacted the plaintiff for that purpose. The plaintiff, which had provided financing for nineteen previous purchases from Norwest,[3] first verified that the Millers' credit rating was satisfactory, then provided Norwest with the retail installment contract and security agreement (retail installment contract), which provided that the retail installment contract would be assigned to the plaintiff by Norwest after it was executed. On May 12, 2000, Norwest and the Millers signed the retail installment contract. Subsequently, the plaintiff sent Norwest a check dated May 16, 2000, for $32,773, the balance owed on the boat. The retail installment contract contained a representation by Norwest to the plaintiff that the boat had been delivered to the Millers and that they had accepted it.[4]

[2] Specifically, the purchase agreement provided in relevant part: "Buyer states that he/she has inspected and examined the equipment which is the subject of this [a]greement and determined that the equipment is of satisfactory quality and is suitable for the purpose for which it is purchased."

[3] As had been their arrangement in previous transactions, the plaintiff paid Norwest a fee of approximately $1200 for referring the financing to the plaintiff.

[4] In a section of the retail installment contract entitled, "Seller's Agreement with Lender," the contract lists various warranties and representations made

At the Millers' request, in the two weeks after Norwest and the Millers had signed the retail installment contract, Norwest installed a depth finder and a radio on the boat, and primed and painted the bottom of the boat, at a total cost of $1222. Because the boat was not ready by the originally scheduled delivery date of May 20, 2000, Norwest and the Millers agreed that the Millers would take delivery of the boat on the Saturday of Memorial Day weekend, May 27, 2000. That Saturday, the Millers went to Norwest to pick up the boat. When one of Norwest's employees took the Millers out for a ride on the boat, however, it did not perform satisfactorily. Because of the holiday, there were no mechanics available to evaluate the problem or to repair the boat until the following Tuesday. When mechanics examined the boat, they discovered a minor mechanical problem, namely, that a piece of fiberglass had become lodged in the pickup tube from the gas tank to the carburetor, and was interfering with the flow of fuel, thus preventing the boat from getting sufficient fuel to operate at a normal speed. Norwest ordered a new tube, which was installed the next day. Because the work done to repair the boat was under warranty, there was no charge to the Millers. When the boat was retested, it was found to be in proper working order.

Norwest attempted several times to contact the Millers, leaving telephone messages informing them of the discovery and nature of the problem and the repair of the boat. The Millers did not respond, nor did they return to the boatyard to check the status of the boat. Instead, they sent Norwest a letter, with a copy to the plaintiff, expressing their dissatisfaction with the boat and purporting to refuse to accept delivery. Subsequently, on June 6, 2000, the Millers sent a letter to the plaintiff, returning the payment coupon books that the

by Norwest to the plaintiff, including: "The [p]roperty has been delivered to the [b]uyer or [c]o-buyer(s), and said [p]roperty has been accepted."

plaintiff had sent to them, and informing the plaintiff that, because they had not accepted delivery of the boat, they would not be making payments to the plaintiff. In the meantime, Norwest had sent most of the money paid to it by the plaintiff to the boat manufacturer, Donzi Marine, retaining a portion as its profit. Eventually, by agreement of the parties to this action, Norwest sold the boat to a bona fide purchaser for $19,500.[5]

The record reveals the following procedural history. The plaintiff brought this action against both the Millers and Norwest, alleging that the Millers breached the retail installment contract by failing to make the monthly payments as required under the contract. As to Norwest, the plaintiff alleged that Norwest had warranted that the plaintiff had a security interest in the boat because the boat had been delivered to and accepted by the Millers, and then breached that warranty by refusing to refund to the plaintiff the amount that the plaintiff had paid to Norwest for the boat.[6] Norwest filed a cross claim against the Millers, seeking to recover for the services and goods it had provided for the boat prior to the attempted delivery, and for storage costs it had incurred after the Millers failed to take possession of the boat. The Millers filed a counterclaim against the plaintiff and a cross claim against Norwest, claiming, inter alia, that both parties had violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., and had committed fraud. The Millers also alleged that the plaintiff had breached a statutory duty owed to the Millers pursuant to § 42-100c, to investigate the dispute between the Millers and

___

[5] The plaintiff is holding the proceeds of the sale in an escrow account pending the outcome of this action.

[6] The plaintiff also alleged that both the Millers and Norwest had been unjustly enriched to the detriment of the plaintiff by the failed transaction, and that Norwest had violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., by engaging in an unfair and deceptive act resulting in the plaintiff's loss.

Norwest prior to any attempt to enforce the debt against the Millers.

The trial court concluded that, because both the purchase agreement and the retail installment contract had so provided, the Uniform Commercial Code, General Statutes § 42a-2-101 et seq. (code), applied to the transaction. Under the provisions of the code, the court found that the Millers had accepted the boat, both by signing the purchase agreement and the retail installment contract, each of which contained representations that the Millers had accepted the boat, and by undertaking subsequent actions inconsistent with Norwest's ownership of the boat. The court noted that, pursuant to the Millers' agreement in writing, title to the boat transferred to them on May 16, 2000, when the plaintiff sent the check to Norwest for the purchase price of the boat. Based on its finding that the Millers had already accepted the boat, the court further concluded that their subsequent attempt to revoke that acceptance without first allowing Norwest a reasonable time to repair the boat was wrongful. The court also rejected the Millers' claim that their June 6, 2000 letter to the plaintiff had obligated the plaintiff, pursuant to § 42-100c, to investigate the dispute between Norwest and the Millers. Accordingly, as to the plaintiff's claim against the Millers, the court rendered judgment in favor of the plaintiff, including an award of attorney's fees, for $55,381.33. The court ordered that the funds held in escrow; see footnote 5 of this opinion; were to be turned over to the plaintiff in partial satisfaction of the judgment against the Millers.[7] As to Norwest's cross claim, the court awarded Norwest $1222 for the cost of installing the depth finder and radio and painting the bottom of the boat.

[7] Because the plaintiff's claim against Norwest had been pleaded in the alternative, the court noted that its judgment in favor of the plaintiff and against the Millers extinguished the plaintiff's claim against Norwest.

The Millers appealed from the judgment of the trial court to the Appellate Court, which reversed the judgment of the trial court based on its conclusion that the Millers had never accepted the boat. *First National Bank of Litchfield* v. *Miller*, 97 Conn. App. 388, 400, 904 A.2d 1282 (2006). The Appellate Court also concluded that the trial court incorrectly had determined that § 42-100c did not apply to the transaction.[8] Id., 399–400. We granted the petitions for certification to appeal by the plaintiff and Norwest. See footnote 1 of this opinion. These appeals followed.

I

We first address the question of whether the Appellate Court properly concluded that the Millers had not accepted the boat. Both the plaintiff and Norwest contend that the Appellate Court improperly applied plenary review to the trial court's factual finding that the Millers had accepted the boat. We agree.

General Statutes § 42a-2-606 (1) defines what constitutes acceptance of goods: "Acceptance of goods occurs when the buyer (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or (b) fails to make an effective rejection as provided by subsection (1) of section 42a-2-602, but such acceptance does not occur

---

[8] In his dissenting opinion, Judge Bishop disagreed with the majority's conclusion that the issue of whether the Millers had accepted the boat was a question of law. Instead, treating the question as one of fact, the dissent concluded that the court's determination that the Millers had accepted the boat was not clearly erroneous. *First National Bank of Litchfield* v. *Miller*, supra, 97 Conn. App. 400–401 (*Bishop, J.*, dissenting). The dissent also took issue with the majority's conclusion that § 42-100c applied under the facts of the present case, on the ground that the statute applies when a debtor in a retail credit account reports an error in a statement, and does not apply when, as happened here, debtors inform a creditor that they intend to cancel an account with the creditor due to a dispute regarding the underlying transaction. Id., 403–404. We agree with the dissent.

until the buyer has had a reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him." Because the question of whether a buyer has accepted goods is a question of fact, a trial court's finding with regard to acceptance will not be disturbed unless it is clearly erroneous.[9] *Plateq Corp.* v. *Machlett Laboratories, Inc.*, 189 Conn. 433, 439–40, 456 A.2d 786 (1983) (applying clearly erroneous standard of review to trial court's finding that defendant buyer accepted goods, listed among court's factual findings); *John J. Brennan Construction Corp.* v. *Shelton*, 187 Conn. 695, 709, 448 A.2d 180 (1982) (same). Application of this deferential standard of review to a trial court's factual finding is in accordance with the nature and limitations of this court as an appellate tribunal, and correctly recognizes that the trial court is the appropriate forum for the resolution of factual disputes. In applying the clearly erroneous standard of review, "[a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported." (Internal quotation marks omitted.) *Lydall,*

---

[9] The Appellate Court, in determining that the question of whether the Millers had accepted the boat was a question of law subject to plenary review, relied on the principle that "when the evidence with respect to acceptance of goods admits of only one reasonable conclusion, the issue becomes one of law." (Internal quotation marks omitted.) *First National Bank of Litchfield* v. *Miller*, supra, 97 Conn. App. 394, quoting 67 Am. Jur. 2d 697, Sales § 578 (2003). Because we conclude that the evidence reasonably would admit of more than one conclusion, it is not necessary for us to address whether the principle is one that we follow, or, if not, whether to adopt it. The Appellate Court further indicated that acceptance is a question of law in the present case because determining whether the trial court properly applied the provisions of General Statutes § 42a-1-101 requires statutory interpretation. *First National Bank of Litchfield* v. *Miller*, supra, 394. We disagree.

*Inc.* v. *Ruschmeyer*, 282 Conn. 209, 246, 919 A.2d 421 (2007). This distinction accords with our duty as an appellate tribunal "to review, and not to retry, the proceedings of the trial court." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 156, 920 A.2d 236 (2007).

The record reveals that the trial court had ample support for its finding that the Millers had accepted the boat. The court based its finding both on the fact that the Millers had signed both the purchase agreement and the retail installment contract and on the numerous actions by the Millers, subsequent to the purchase of the boat, that were inconsistent with Norwest's ownership of the boat.[10] The purchase agreement provided that the Millers had inspected the boat at the time that they signed the agreement and that they were satisfied with it.[11] This representation by the Millers to Norwest

[10] The Millers misstate the trial court's reasoning, asserting that the trial court grounded its finding of acceptance on its conclusion that ownership of the boat transferred on May 16, 2000, when the plaintiff sent its check to Norwest in payment for the boat. As we have already stated, however, the trial court's memorandum of decision is clear that its finding of acceptance was predicated on the fact that the Millers signed two contractual documents that contained representations that they had accepted the boat, and on the actions undertaken by the Millers that were inconsistent with Norwest's ownership of the boat.

[11] The Millers contend that, because they did not have the opportunity to take the boat out for a test ride until Memorial Day weekend, they did not have a reasonable opportunity to inspect the boat until that time, and, therefore, it was legally impossible for them to have accepted the boat prior to that time. They rely on the principle that what is reasonable is determined in reference to the applicable circumstances, in this case, that the item sought to be purchased was a vehicle, and that the most reasonable manner to inspect a vehicle is to test drive it. We first reiterate that the standard of review of the trial court's factual finding is highly deferential. Moreover, the Millers' argument ignores a significant circumstance that distinguished this transaction for goods and informed the trial court's determination that the Millers had been afforded a reasonable inspection of the boat. The Millers did not purchase *any* vehicle. They purchased a boat during spring in New England. The trial court particularly found that it is not uncommon for buyers to purchase a boat during the off season, deferring delivery until later. Presumably, buyers who wish to take a boat for a test ride prior to

supports the trial court's finding of acceptance because it indicates that the Millers, "after a reasonable opportunity to inspect the goods," had signified to Norwest "that the goods [were] conforming . . . ." General Statutes § 42a-2-606 (1) (a).[12] The retail installment contract also contained a representation by Norwest that the boat had been accepted by the Millers. Although the Millers did not make this representation, they signed the retail installment contract, which was a preprinted form that contained the representation under a section

accepting delivery will wait until the weather permits that form of inspection before signing contracts in which they represent that they have inspected the boat and found it satisfactory, and before having the boat customized to suit their needs. Buyers who do not wait until warmer weather permits a test ride essentially have weighed the advantages of a more thorough inspection versus the instant satisfaction of purchasing the boat immediately, and relying on a less reliable means of inspection, and opted for the latter.

Similarly, we find unpersuasive the Millers' reliance on General Statutes § 42a-2-507 (1), which provides that "[t]ender of delivery is a condition to the buyer's duty to accept the goods and, unless otherwise agreed, to his duty to pay for them. . . ." The Millers confuse having a duty to accept goods with having accepted goods. The trial court did not find that the Millers had a duty to accept the boat, but rather that they *did* accept it. The fact that the Millers could have chosen to wait until delivery before accepting the boat cannot change the fact that they did not choose to do so. Once they accepted the boat, the question of whether they had a duty to do so became irrelevant.

[12] The Millers contend that this clause in the purchase agreement had no effect because it was boilerplate language included on the purchase agreement form that they signed. They cite authority from other jurisdictions for the proposition that the signing of a form acceptance prior to the receipt of goods is not determinative of acceptance. The trial court, however, grounded its finding of acceptance not only on the contractual evidence; see General Statutes § 42a-2-606 (1) (a); but also on the completely independent ground that the Millers had engaged in actions that were inconsistent with Norwest's ownership of the boat. See General Statutes § 42a-2-606 (1) (c). Because the court's finding based on the Millers' actions that were inconsistent with Norwest's ownership of the boat alone would have been sufficient to justify its determination that the Millers had accepted the boat, it is unnecessary for us to resolve the issue of whether Connecticut law dictates that the signing of a form acceptance prior to receipt of goods is not determinative of acceptance.

of the contract entitled, "Seller's Agreement With Lender."[13]

The court also grounded its decision on an independent basis for finding acceptance, namely, that the Millers had engaged in acts inconsistent with Norwest's ownership of the boat. See General Statutes § 42a-2-606 (1) (c) (acceptance of goods occurs when buyer does any act inconsistent with sellers ownership). The court expressly grounded this finding on evidence that the Millers had obtained a temporary certificate of registration of the boat in their names. The record reveals additional facts that provide support for this aspect of the trial court's finding, including the Millers' request that Norwest install a depth finder and radio on the boat and paint the bottom of the boat.[14] Based on the record before the trial court, its conclusion that the Millers had accepted the boat was not clearly erroneous.[15]

---

[13] The Millers contend that the trial court improperly relied on this representation by Norwest to the plaintiff in the retail installment contract because the representation appeared in the portion of the agreement that was between Norwest and the plaintiff. The Millers also point to the fact that, when they signed the contract, no agent for Norwest had signed the portion of the contract that contained Norwest's representations and warranties to the plaintiff, and to the fact that, as of May 12, 2000, the boat had not yet been delivered, as Norwest represented in the statement. As we have noted in this opinion, however, we do not retry the evidence, but rather determine whether there is sufficient evidence in the record to support the trial court's factual finding that the Millers accepted the boat. We need not address, therefore, the Millers' claim that Norwest's representation in the retail installment contract does not support the trial court's finding of acceptance because even without that evidence, the record contains ample evidence to support the trial court's finding.

[14] The Millers urge us to find that none of these acts were inconsistent with Norwest's ownership of the boat, based on evidence they had presented that such alterations routinely were performed as part of the purchase of a boat. In reviewing the factual findings of the trial court, we do not determine what we would have found had we been the fact finder; rather, we determine only whether the evidence in the record supports the court's findings.

[15] As an alternate ground for affirmance of the judgment of the Appellate Court, the Millers contend that Norwest's representation to the plaintiff, in the seller's agreement within the retail installment contract, that the boat

## II

We next consider whether the Appellate Court improperly concluded that § 42-100c required the plaintiff to investigate the underlying controversy between the Millers and Norwest. We conclude that the statute does not apply under the circumstances of the present case.

This issue arises from the Millers' claim that their letter to the plaintiff, dated June 6, 2000, through which they purported to "cancel" their account with the plaintiff, and in which the Millers informed the plaintiff of their refusal to take delivery of the boat and of their intent not to repay the loan, obligated the plaintiff, under § 42-100c, to investigate the matter.[16] The Millers

had been delivered to and accepted by the Millers, constituted a breach of the warranty that Norwest had made to the plaintiff, and extinguished the Millers' obligation to repay the loan. This argument has no merit. The warranties that Norwest made in the seller's agreement were to the plaintiff, not to the Millers. The mere fact that the plaintiff argued, in the alternative, that Norwest would be obligated to repay the loan if the trial court concluded that the Millers were not so obligated, does not mean that the plaintiff in any way conceded, as the Millers claim, that if Norwest's representation in the seller's agreement was not accurate, the plaintiff could not recover against the Millers. The Millers agreed, in the retail installment contract, to repay to the plaintiff the amount of the loan. They are bound by that agreement.

[16] The June 6, 2000 letter stated in full: "We are returning to you three coupon books that relate to the above-cancelled account. The account in question was a loan to finance a Donzi [Z]20 boat from Norwest Marine, Inc. As the enclosed letters indicate, we never took delivery of the boat due to Norwest's repeated failures to deliver a boat in good working order. As the letters further indicate, the sale was cancelled within two working days following Norwest's failure to do so. In fact, the sale would have been cancelled on the first working day following Norwest's second failure to deliver the boat, but for the fact that Federal Express was not available because I was on a trial in Vermont and May 30th was a legal holiday there.

"You should know that we have been contacted by an attorney for Norwest. Norwest is taking the position that the sale was final and not cancellable. We disagree completely with that view and will be happy to litigate the matter with Norwest. In the meantime, we expect your bank to cancel this account. We are putting you on notice that this matter is in dispute and that we have no intention of paying for a boat that we have rejected as

claim that the bank, upon receipt of their June 6 letter, had a duty to investigate the "claimed error" and also had a duty to refrain from trying to enforce collection of the debt pending the result of the plaintiff's investigation.

Section 42-100c requires a creditor to investigate a debtor's complaint that there is an error in a statement of the debtor's account with the creditor.[17] In its rejection of the Millers' argument, the trial court concluded that the statute did not apply under the facts of the present case, explaining, "the statute refers to notification by a debtor of an error in a 'retail credit account' sent by a creditor to a debtor. This, in turn, requires a creditor to investigate whether there was such an error.

---

unsuitable (and from a seller that we have rejected as unsuitable). We are also taking steps to cancel the insurance we obtained for the boat.

"Please take all necessary steps to insure that our credit is not adversely affected as a result of this matter. If you need to contact me, you may reach me at my office."

[17] General Statutes § 42-100c provides: "(a) If a debtor, upon receipt of a statement of his account under a retail credit transaction, believes that there is an error in such statement as to the whole or any part of the amount shown as owing to the creditor, he may, in writing, not later than sixty days from the date of mailing of such statement, so notify the creditor, stating the basis or reasons for his belief that the statement is in error. The creditor shall within thirty days after receipt of such notification send a written acknowledgment to the debtor, and no later than two complete billing cycles of the creditor but in no event more than ninety days after receipt of the notification, investigate the debtor's complaint and make the necessary corrections in such account and submit a corrected statement or send a written explanation to the debtor setting forth the reasons why the creditor believes the account is correct as shown in the statement. Prior to completing such investigation, the creditor shall take no action to collect the amount in dispute or to in any way affect the debtor's credit rating.

"(b) Any creditor who fails to comply with the provisions of subsection (a) of this section shall: (1) Forfeit any right to collect from the debtor the amount in dispute and any interest, service, finance, carrying or other charge on such amount, and (2) if such amount is in fact in error, be liable to the debtor for the actual damages sustained by him as a result of such failure of the creditor to comply, or twice the amount referred to in subdivision (1), whichever is greater, and in the case of any successful action to enforce such liability, the costs of the action together with attorney's fees."

The Millers did not claim there was an error in the 'statement of account' that they were seeking to have corrected, but rather, they were notifying the plaintiff that they were canceling the transaction itself and refusing to make any payments at all." The Appellate Court, in concluding that § 42-100c applied under the facts of the present case, concluded that under the plain language of the statute, the Millers had reported an error "as to the whole amount" of the statement. *First National Bank of Litchfield* v. *Miller*, supra, 97 Conn. App. 400. We disagree.

This issue presents a question of statutory interpretation over which our review is plenary. *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 294, 933 A.2d 256 (2007). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Internal quotation marks omitted.) Id.

The specific question we must resolve is whether a debtor who wishes to "cancel" a loan based on the debtor's decision to cancel the underlying transaction giving rise to the loan is a debtor who "believes that there is an error in [a] statement [of his account under a retail credit transaction] as to the whole or any part of the amount shown as owing to the creditor . . . ." General Statutes § 42-100c (a). Put simply, the question is whether a debtor who reports to a creditor that he or she wishes to cancel a loan agreement based on the debtor's decision not to take delivery of goods is reporting an error in a statement of account. To so conclude would distort the meaning of the word "error." As the trial court correctly reasoned, the Millers did not report an error in the amount of the statement,

but rather reported their intent to cancel the entire transaction. No reasonable interpretation of the June 6, 2000 letter sent to the plaintiff could lead to the conclusion that the Millers were communicating a belief that there was an error in a statement of their account. They wished to rescind the loan transaction. The mere fact that canceling the entire transaction affected the "whole . . . amount shown as owing to the creditor"; General Statutes § 42-100c (a); did not transform the Millers' declaration that they did not intend to abide by the terms of the retail installment contract into a statement that there was an error in their account. The trial court correctly concluded that § 42-100c did not apply under these circumstances.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.